[No. A053941. First Dist., Div. Two. Jan. 15, 1993.]

SIERRA CLUB, Plaintiff and Respondent, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant;
COUNTY OF MENDOCINO, Real Party in Interest and Appellant.

COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan. S. Stevens, Acting Assistant Attorney General, and Patricia Sheehan Peterson, Deputy Attorney General, for Defendant and Appellant.

H. Peter Klein, County Counsel, and Yves A. Hebert, Deputy County Counsel, for Real Party in Interest and Appellant.

Joseph J. Brecher for Plaintiff and Respondent.

OPINION

SMITH, J.—The Sierra Club petitioned the superior court for a writ of mandate (Code Civ. Proc., § 1094.5) against a decision of the California

Coastal Commission (Commission) approving and certifying a land-use plan (LUP) of real party in interest, the County of Mendocino (County), as consistent with the California Coastal Act of 1976 (Coastal Act or Act) (Pub. Resources Code, § 30000 et seq.).[1] The Commission and County appeal from the court's issuance of a peremptory writ commanding the Commission to set aside its approval for failure to confer environmentally sensitive habitat area (ESHA) status (§§ 30107.5, 30240) on pygmy forest areas. We affirm.

## BACKGROUND

The Coastal Act requires a coastal county to have a local coastal program (LCP), including an LUP, which meets the requirements of, and implements the provisions and policies of, the Coastal Act at the local level. (§§ 30108.6, 30100.5.)

A county may ask the Commission to prepare all or part of an LCP (§ 30500, subd. (a)), and that happened here. The County in 1978 asked the Commission to draft a coastal LUP (the coastal element of its general plan), and the Commission, after public hearings and input from staff and citizen advisory committees, produced a consultant-prepared draft in November 1980 (augmented with staff and committee comments in April 1981) for County review.

The draft in part identified "pygmy" and "pygmy-type" vegetation in the coastal zone, noting that its preservation was threatened: "Two types of pygmy vegetation exist along the Mendocino coast. Both are characterized by stunted trees but have different soil and vegetation types. True pygmy forests are valuable to scientists because they are probably the best example of a living community in balance with its ecosystem. Pygmy forest vegetation covers about 1,050 acres in the coastal zone, including areas in public ownership at Jughandle State Reserve and Van Damme State Park. Pygmy-type forest accounts for about 1,120 acres, mainly between Pt. Arena and Haven's Neck. Because pygmy vegetation is found in a section of the coast experiencing development pressures and because it yields no revenue from agriculture or timber, its preservation has become an issue. An immediate environmental concern is the ability of pygmy soils to provide satisfactory leaching fields for septic systems. Five acres per dwelling unit appears to be the maximum satisfactory density in pygmy soils, and an even lower density may be necessary in some areas. . . ."

---

[1] All undesignated section references are to the Public Resources Code.

The draft did not mention ESHA status for those areas but included a policy limiting density to one housing unit every five acres and addressing the perceived leach-field problem.[2]

The County held its own public hearings on the draft, and its planning commission and board of supervisors adopted it with various revisions, none of which conferred ESHA status on the pygmy areas. The draft was referred by resolution to the Commission for certification consideration in late 1983.

The Commission held a public hearing on the adopted LUP on May 8, 1985, and found substantial issue as to Coastal Act consistency. The Commission unanimously denied certification of the LUP as submitted, in part due to concern that ESHA designation was not given to pygmy forests.[3]

The County had requested suggestions for curative modifications should certification be denied (§ 30512, subd. (b)), and the Commission continued the matter for alternatives to be worked out. The County proposed mitigation measures short of ESHA designation (except where endangered species might be found), but a September 12, 1985, Commission staff report adhered to the need for ESHA status for pygmy forests plus greater protection of pygmy and pygmy-type vegetation generally, including supporting soils.[4] The County responded formally, standing by its mitigation measures in lieu of ESHA designation.

---

[2]"3.1-20 Development within areas of pygmy and pygmy-type vegetation shall be limited to one housing unit per five acres and shall be approved only upon demonstration that two satisfactory septic system leach fields exist. Parcels shall not be divided in a manner that would create building sites or leach fields in areas of pygmy vegetation. This policy shall take precedence over parcel size and density standards specified by the land use classification shown on the Land Use Plan map."

The draft also contained these definitions: "*Pygmy Vegetation.* A stunted forest, 2-12 feet in height occurring on soils allowing little vegetation growth, such as Noyo or Blacklock soils, and characterized by cypresses, hairy Manzanita, beach pines, and pygmy Mendocino bishop pines. [¶] *Pygmy-type Vegetation.* A forest occurring south of the Navarro River, mainly on Gualala series soils, characterized by stunted vegetation on sites with low commercial timber value. Plant species include knobcone pines and manzanita."

[3]A Commission staff report prepared for the May 8 hearing recommended increasing protection for pygmy and pygmy-type vegetation by tightening the language of LUP policy numbers 3.1-20 (fn. 2, *ante*) and 3.1-21. It also recommended modifying 3.1-21 to give ESHA status to actual pygmy forests by the following language (proposed changes indicated by strike-overs and italics): "Pygmy forests are unique ecosystems which may contain species of rare or endangered plants and t̶h̶e̶r̶e̶f̶o̶r̶e̶/̶m̶a̶y̶/̶b̶e̶ *are* environmentally sensitive habitat areas."

[4]The September 12 staff report said of pygmy forests: "Extensive input was received at the May 8 hearing about the uniqueness and value of this ecosystem. Additional correspondence was received after the hearing which substantiates the Commission's finding that the pygmy forest is an ESHA as defined in Section 30107.5 of the Coastal Act. . . . The policy which the County has proposed in their response to the suggested modifications (Policy 3.1-21) does not recognize the pygmy forest ecosystem as an ESHA, as their definition limits the ESHA to

The Commission reopened consideration of the suggested modifications and took additional testimony at a lengthy hearing on September 26. At its conclusion, a divided Commission voted to approve the LUP as amended to include the County's mitigating measures rather than the staff proposals for ESHA designation.

The approved LUP regulated "pygmy vegetation," limited to "stunted forest" and excluding pygmy-type vegetation or mere pygmy soils.[5] It denied ESHA status to regulated forests unless they contained rare or endangered plant species. However, development of pygmy vegetation land was limited to "low density (defined as 2 to 5 acres)," consistent with County water-quality and ecosystem regulations, with further study of environmental impacts to follow. Parcels "entirely within" pygmy vegetation areas required planned development (PD) with measures designed to mitigate adverse environmental and septic concerns.[6]

---

that with rare or endangered species. If the suggested modification [in this report] is adopted, the pygmy forest would be recognized as an ESHA as defined in Section 30107.5 of the Coastal Act. Thus, appropriate protection would be provided to this ecosystem by preventing developments which are not dependent upon the resources[,] consistent with Section 30240 of the Coastal Act."

The report urged revising policy number 3.1-20 to restrict development on pygmy and pygmy-type soils. Policy 3.1-21 would read in part: "Pygmy forests are unique ecosystems with a very limited distribution, which can be easily degraded by human activities and therefore are environmentally sensitive habitat areas. *These pygmy forests* may *also* contain species of rare or endangered plants. . . ."

[5]The definition reads (changes shown): *"Pygmy Vegetation. A stunted forest, with mature vegetation the majority of which is approximately* 2-12 feet in height occurring on soils *with conditions which severely limit the growth of vegetation* ~~allowing little vegetation growth~~ such as Blacklock soils, and characterized by *Mendocino* cypresses, ~~hairy~~ *Fort Bragg* Manzanita, ~~beach~~ *Bolander* pines, and pygmy Mendocino bishop pines."

New Policy 3.1-21 reads in part (revisions noted): "Pygmy forests are unique ecosystems which may contain species of rare or endangered plants and *if they do they* therefore may be *are* environmentally sensitive habitat areas. *Other pygmy forest areas that do not contain species of rare or endangered plants will not be included in the environmentally sensitive habitat areas.*

"New development on parcels with pygmy vegetation shall be located in the least environmentally damaging locations and shall minimize the removal of native vegetation and alteration of natural landforms. Within one *two* years *or sooner after certification* ~~of the adoption~~ of the Local Coastal Plan, Mendocino County shall ~~correct~~ *review and evaluate* the Land Use and Habitat/Resource Maps to reflect those specific habitat areas *of* ~~After maps have been corrected, designations of specific areas of~~ pygmy forest for habitat protection. ~~shall be considered based on where. bBecause~~ of the quality of habitat, suitability for scientific and educational study, *or* ~~and~~ presence of rare and/or endangered plants, *additional protection* ~~will~~ *may or may not be required.* . . ."

[6]Policy 3.1-20 reads (changes noted): "Soil constraints to conventional septic tank and leach field systems such as those on Noyo and Blacklock soils and similar soils shall be recognized and the use of alternative systems shall be encouraged. Water quality control regulations shall be enforced. Mendocino County Department of Environmental Health shall

After formal adoption of the modified LUP by the County's board of supervisors, the Commission on November 20, 1985, certified it and on February 7, 1986, adopted supporting findings.

The Sierra Club meanwhile filed this action for writ of mandate in superior court two days after the November 1985 certification. The petition challenged in part the Commission's failure to require ESHA status for pygmy forest habitat. Due to the County's party status, venue was transferred by stipulation to Marin County (see § 30806, subd. (a)), where the court heard the matter in 1991, confined by then to the ESHA issue.

The court by a written decision concluded that the Commission's decision to certify the LUP without designating and treating the pygmy forest as an ESHA was not supported by substantial evidence in light of the whole record (Code Civ. Proc., § 1094.5, subd. (c)). The court ordered the issuance of a peremptory writ commanding the Commission to set aside its findings and order regarding pygmy forests, to set aside that part of the County LCP and to reconsider its action on remand.

DISCUSSION

I

Our review is governed by Code of Civil Procedure section 1094.5, which defines prejudicial abuse of discretion as an agency's decision being unsupported by its findings or its findings being unsupported by the evidence (*id.,*

---

be directed to assess the ability of Noyo/Blacklock soils and soils with similar development constraints to accommodate new development, without adverse impacts, to either the ecosystem or water quality affecting existing residents. Mendocino County Department of Environmental Health shall use the available U.S.D.A. SCS Soils Maps and the Water Quality Control Board documents to assess the cumulative impacts of sewage disposal systems in evaluating these development constraints.

"Limit new development on soil types characterized by pygmy and/pygmy/type vegetation to a low density (defined as 2 to 5 acres) as consistent with County Department of Environmental Health recommendations. Within two years of the certification of the Local Coastal Plan and, at regular intervals thereafter, the Mendocino County Department of Environmental Health shall report any adverse impacts from new development in areas of pygmy and/pygmy/type vegetation. If adverse impacts have occurred, further limits on new development shall be imposed pending mitigation measures.

"*Parcels entirely within areas of pygmy vegetation shall be designated Planned Development (PD). Such parcels shall be allowed to develop consistent with all applicable policies of this plan if mitigation measures are adopted and implemented to prevent or avoid impacts such as: erosion, surface-groundwater contamination, extensive vegetation removal and other related concerns.* The County shall request that the U.S.D.A. SCS Soils mapping project be completed as soon as possible *which will identify parcels that may be removed from the PD requirement. Parcels containing pygmy vegetation shall be allowed to divide only if each new parcel being created has an adequate area available for a residence with a conventional septic system allowing for a 100% back-up area for an alternate leach field.*"

subd. (b)). Where support for findings is challenged, abuse of discretion exists if "the findings are not supported by substantial evidence in light of the whole record" (*id.*, subd. (c)).

■ "The 'in light of the whole record' language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record. [Citation.] Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence. [Citation.]" (*Lucas Valley Homeowners Assn.* v. *County of Marin* (1991) 233 Cal.App.3d 130, 141-142 [284 Cal.Rptr. 427]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 149, fn. 22 [93 Cal.Rptr. 234, 481 P.2d 242].) That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) "It is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency." (*McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 186 [131 Cal.Rptr. 462].)[7]

The County and Commission urge that the trial court misapplied the standard, improperly reweighing the evidence. However, the record as a whole fails to rebut the presumption that duty was regularly performed in that regard. (Evid. Code, § 664; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913-915 [141 Cal.Rptr. 133, 569 P.2d 727].)

Moreover, the whole argument is academic in the procedural posture of this case. Our review standard on appeal is identical to the trial court's.

---

[7]In part because our review is restricted to evidence which was before the agency, we denied a motion by the County to take additional evidence on appeal (Code Civ. Proc., § 909; Cal. Rules of Court, rule 23) consisting of a draft report, Water Quality and Ecosystem Impacts from Development in Areas of Pygmy Vegetation, prepared for the County by Questa Engineering Corporation of Point Richmond, California, with state and federal financial assistance. The draft, dated March 1992, was not before the Commission or court below. Also, it is only a draft, subject to modification, and does not definitively compel a reversal with directions, as it must to warrant consideration. (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 280 [280 P. 970]; *Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 270 [239 P.2d 625]; *Estate of Schluttig* (1950) 36 Cal.2d 416, 422 [224 P.2d 695]; *Monsan Homes, Inc.* v. *Pogrebneak* (1989) 210 Cal.App.3d 826, 830-831 [258 Cal.Rptr. 676].) In fact, much of the report supports the judgment. (Cf. *Kabisius* v. *Board of Playground, etc.* (1935) 4 Cal.2d 488, 494 [50 P.2d 1040].)

The Commission represents that the draft report, which recommends modifying previously designated pygmy vegetation areas to conform to other mapping, will necessitate the County returning to the Commission for amendment of its LUP. We of course express no view on the substance of the report or its effect in any further proceedings.

(*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 149 & fn. 22.) Therefore, if substantial evidence supports the Commission's action, we reverse; if not, we affirm. Possible misapplication of the review standard below has no bearing on the outcome here. (Cf. *id.,* at p. 149, fn. 22 [because the review standard on appeal was the same, any error in the trial court's use of an " 'isolation' " test for substantial evidence offered no ground for reversal].)

## II

At issue is whether substantial evidence supports the Commission's decision to deny ESHA status to pygmy forests. Section 30107.5 provides this two-part test for ESHA status (numbering ours): " 'Environmentally sensitive area' means any area [1] in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and [2] which could be easily disturbed or degraded by human activities and developments."

The consequences of ESHA status are delineated in section 30240: "(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas." Thus development in ESHA areas themselves is limited to uses dependent on those resources, and development in adjacent areas must carefully safeguard their preservation.

The Commission ultimately decided that pygmy forests do not require ESHA designation. Its findings acknowledge the unique qualities and value of pygmy forests and that adverse impacts can be expected from development. However, the findings also cite the facts that some pygmy forests along the coast are already protected and that the remainder, while not given full ESHA protection, will be partially protected through mitigation measures prescribed in the LUP, particularly the PD process, so as to minimize adverse impacts.[8] The Commission thus concluded that controls short of ESHA protection satisfy the Coastal Act.

---

[8]"1. Much of the pygmy forest is in public ownership: Jughandle State Reserve, Van Damme State Park and Jackson State Forest, all including Pygmy forest areas, are already protected.

"2. The Commission, since its creation, has never designated pygmy forest as an ESHA, nor [do] the Commission's 'Statewide Interpretive Guidelines' descriptions of ESHA include pygmy forest.

"3. No past Commission permit decisions have recognized pygmy forests as being ESHA.

"4. The pygmy forest area has already been extensively developed as a residential area.

"5. The ESHA designation of an entire parcel would prohibit the development of a single

*Rare or valuable habitat*

■ Our review of the record shows that the pygmy forest is a rare or valuable habitat qualifying for protection under ESHA's first prong (§ 30107.5). There is no substantial evidence to the contrary and no dispute about what characterizes the habitat.

Pygmy forest features severely stunted vegetation, with mature tree growth reaching just two to twelve feet. This is caused by a combination of highly acidic and nutrient-starved soils, cramped root growth, and winter flooding. It is an ecosystem dependent on that peculiar confluence of conditions and has evolved over the millennia on a series of rising, step-like marine terraces, each representing about 100,000 years of plant-soil succession. The surface soils, originally formed of beach deposits, allow rains to leach the soil of nutrients, while a layer of dense hardpan lying just beneath the surface traps water, allowing it to stand. Horizontal layers of bedrock some 10 to 30 feet down aggravate the effect. During winter months of heavy rains, this creates prolonged flood-like conditions, a shallow water table just beneath the surface. On the upper terraces, the hardpan is also impenetrable to roots, creating a natural bonsai-like condition which, together with the poor soil nutrients, stunts growth. Trees like the Mendocino cypress and Bolander pine are among those which have managed to adapt in the hostile habitat.

---

family residence or any other use which is not dependent on the resource (i.e. scientific study).

"6. Although the County's adopted policy section 3.1-20 states that parcel sizes in pygmy forest areas can be 2 and 5 acres, the impact of this is minimal: the only RR-2 and RR-5 pygmy areas are those already divided into small parcels. Other pygmy areas are designated as low density RR-10, RMR-20, RMR-40 and FL-160. With these densities, approximately 12 parcels can be created, and this would have minimal impact to the area.

"7. The County's proposed modifications to Policies 3.1-20 and 3.1-21 recognize pygmy forest as a unique ecosystem with the potential of being adversely impacted by development unless strict controls are applied. . . .

"8. The County recognizes that pygmy forests which contain a species of rare or endangered plants are to be accorded ESHA status and that the protections of Section 30240(a) would apply to those areas. Based upon the above considerations, the Commission finds no compelling reasons to extend the ESHA designation in the [LUP] to pygmy forest areas generally at this time. . . . [T]he Commission adopts the County's proposed modifications of policies 3.1-20 and 3.1-21. . . . Acceptance by the County of these recommended modifications would provide adequate protection for those pygmy forest areas which may qualify for ESHA status and satisfy the requirements of Section 30240(a) of the Act, as well as extending extra protection to those areas of pygmy forest not designated ESHA, but which because of their unique place in the ecosystem require extra development controls. Although some adverse impacts on pygmy forest resources can be expected with implementation of these policies, these impacts will not be substantial enough to warran[t] adoption of alternatives or further mitigation."

The record conclusively shows pygmy forest to be a rare and valuable habitat. The Commission's own findings call it "a unique ecosystem" (fn. 8, *ante*) and echo expert testimony that it "allow[s] scientists to review 'the longest and most complete record of geological plant succession know[n]— between one-half and one million years.'" The habitat is the subject of worldwide scientific interest and study, plus lay interest, drawing 45,000 visitors yearly to stands of pygmy forest in the Jughandle State Reserve alone. The habitat is unique in the world and is found almost exclusively within Mendocino County. (The record indicates that some areas of pygmy soils have been identified in Sonoma County, where they are protected against all development.) The County has 1,050 acres of it, some amount of that being not in the coastal zone, but further inland.

Arguing against the rare-or-valuable-habitat prong, the County and Commission point to evidence and findings that significant portions of pygmy forest are already preserved in Jughandle State Reserve, Van Damme State Park and Russian Gulch State Park. However, this hurts more than helps them. The fact that, as the Commission found, the Pygmy Forest Reserve in Jughandle State Reserve "was designated as a National Registered Natural Landmark" in 1969, hardly justifies the denial of ESHA status to the few pygmy forest habitats existing elsewhere in the county. Nothing in the Coastal Act allows denial of ESHA status to rare or valuable habitats just because they are partially protected outside the aegis of the Act. The Act demands the permanent protection and maintenance of coastal zone resources (§§ 30001, subds. (a)-(c), 30001.5, subd. (a)), with heightened protections for ESHA's (§ 30240). To allow the destruction of ESHA areas through development simply because some of the habitat is preserved in parks would undermine the protective goal. It would relegate parts of rare habitat to parks and hasten the same habitat's loss elsewhere. We reject that view of the Act.

We are also not persuaded that the existence of pygmy forest areas *outside the coastal zone* allowed the Commission to discount the overall habitat's special value or rarity. The Commission, noting some uncertainty about existing inventories and mapping of pygmy forest areas, found that there were about 1,050 acres of it situated on sea-cut terraces "in and out" of the coastal zone between Fortt Bragg and the Navarro River, some found in "scattered patches."[9] The Commission did not find *how much* acreage is outside the coastal zone. However, it is clear from all record descriptions of

---

[9]"The pygmy forest, a stunted forest area two to twelve feet in height and underlain by a hardpan layer which accounts for the area's poor drainage, occupies approximately 1,050 acres in central Mendocino County. Some of it is outside the coastal zone. There is some uncertainty about the accuracy of existing inventories and mapping of this resource area. The

the habitat (i.e., that they were formed from beach soils on marine terraces along the coast) that the areas lying outside the coastal zone are near it. The habitat is a coastal phenomenon, but the Act's exacting definition of "coastal zone" (§ 30103, subd. (a) [inland 1,000 yards from the mean tide line or, in some areas, the lesser of 5 miles or the distance to the first major ridgeline]) will often arbitrarily divide such a habitat.

The point here is that pygmy forest appears from the record to be a uniquely coastal habitat. The fact that "some" undetermined part of it extends over the coastal zone boundary cannot excuse the Commission's failure to find it a rare or especially valuable habitat meriting ESHA status. There is no merit to the suggestion in the Commission's briefing that ESHA status is reserved for "a unique, rare ecosystem found *only* in the coastal zone" (italics ours). The existence of a habitat throughout a county would obviously affect whether that habitat, as found in the coastal zone, is rare or valuable. However, our record merely shows a coastline habitat which in places extends over the coastal zone line.

The Commission and County cite testimony by landowner Jacques Helfer: "[T]he Pygmy Forest is not one forest. It's a scattered patch of pieces of Pygmy Forest. The very best corridor with large segments of each of the five terraces is that transect at Jug Handle Creek and that has been preserved. [¶] There are in addition significant patches of Pygmy Forest in Russian Gulch State Park and in Van Damme State Park, completely protected. It is not necessary to protect every last patch of Pygmy Forest. . . ."

A recurrent theme in the briefing is that, given the Commission's supported findings that pygmy forest existed in "scattered patches" and that significant patches were already protected (fn. 9, *ante*), the Commission was entitled to conclude that not "all" patches of pygmy forest had to be given ESHA protection.

The trouble with the argument, however, is that the Commission refused to give ESHA status to *any* pygmy forest. The Commission and County are caught up in hyperbole, accusing their opponent of wanting all pygmy forest protected, regardless of how scattered or transitional the patches. The court's judgment ordered no such thing. The court used the term "pygmy forest," which has been used in this litigation and most of the administrative proceedings to denote full pygmy forest, not mere pygmy-type vegetation or soils (see fns. 2 and 9, *ante*). The court did not direct which areas must be

---

pygmy forest ecosystem is found along the Mendocino County coast in scattered patches on the higher sea-cut terraces situated in and out of the coastal zone between Fort Bragg and the Navarro River. . . ."

designated pygmy forest or what criteria best defined those areas. The court simply found no substantial evidence for, and therefore reversed, a "decision to certify the [LUP] without designation and treatment of the pygmy forest as [an ESHA]." It did not pass on the question whether ESHA status had to be conferred on "pygmy-type" areas or what lesser protections for them might be consistent with the Act. Those issues are likewise not before us here. The judgment reversed and remanded for further Commission proceedings, carefully preserving agency discretion.[10]

■ We agree that there is no substantial evidence to support denying ESHA status to pygmy forest on the rare-or-valuable element of the statutory definition.[11]

### Degradation by development

■ We also agree that no substantial evidence exists to rebut the showing below that pygmy forest is "easily disturbed or degraded by human activities and development" (§ 30107.5), the second statutory element.

Abundant expert testimony attests to the habitat's easy degradation by development. Most obviously, vegetation removal directly destroys it, but there are insidious hidden effects. Botanist Robert E. Sholars, a noted authority on the habitat, summarized the problems: "Roads, ditches, wells, and septic systems further chop up and degrade the habitat. . . . This plant community that has been remarkably stable for hundreds of thousands of years is extremely vulnerable to erosion following vegetation removal, and to the lowering of the water table by wells, diversions, and drainage. The

---

[10]"You are hereby commanded immediately on receipt of this writ to set aside your findings and order of January 22, 1986 which approved Policies 20 and 21 of the Mendocino County Local Coastal Plan and any other portions of said plan dealing with pygmy forests and to set aside said portion of the Mendocino County Coastal Plan. [¶] Said proceedings are hereby remanded to you, to reconsider your action in the light of this court's judgment and to take any further actions specially enjoined upon you by law; but nothing in this writ shall limit or control in any way the discretion legally vested in you . . . ."

[11]Except as already discussed, the findings below (see fn. 8, *ante*) are both undefended and indefensible. No one argues, for example, that lack of Commission precedent for treating pygmy forest as an ESHA (findings Nos. 2 and 3) is germane; we cannot tell whether ESHA status was ever considered before or, if it was, why it was withheld. The finding that pygmy forest "has already been extensively developed as a residential area" (No. 4) is a reason to *grant* ESHA status, not deny it. (*Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 538 [127 Cal.Rptr. 775] [construing the predecessor Coastal Zone Preservation Act, former § 27000 et seq.].) The finding that ESHA status would restrict development mainly to scientific study (No. 5) adds nothing; the Act demands that protection as an overriding policy (§ 30240, subd. (a)). Finally, giving ESHA status only to areas having rare or endangered plant species (finding No. 8) ignores the pygmy forest habitat itself as rare or valuable.

nutrient-laden discharge from septic systems undoes in years many millennia of natural leaching. . . ." Sholars had seen pygmy forest destruction "at an alarming rate." While the forest had once occupied about 4,000 acres at 28 locations, an inventory he helped take of those sites in 1983 revealed that 14 were "either destroyed or severely degraded. None were entirely undisturbed. . . ."

Those views were shared by retired Professor Hans Jenny, who had taught in the plant and soil biology department at the University of California, Berkeley, and had published several papers on the pygmy forest. He testified having "observed its destruction by the indiscriminate construction of buildings and homes" and possessing "documentation that leach lines from septic tanks alter the composition of the Forest by enriching it in nitrogen and phosphorus which eventually will destroy its character." Retired soils morphologist Rodney Arkley explained that the limited depth of the soils causes polluted water to collect and work its way down stepwise, from terrace to terrace toward the sea.

Slides presented by Dr. Sholars showed disruption from drainage installed to permanently lower the water table for house construction. Mendocino cypresses growing in septic effluent for only five years had grown to triple the height of their sixty-year-old counterparts several hundred feet away. He described a "long term ecosystem that is changing rapidly" due to development pressures. Other speakers and writers mirrored those concerns.

Some arguably contrary views were voiced, but they lack substantiality for the speakers' apparent lack of training or other qualifications. A County supervisor, for example, revealed no basis for his view that development would not harm "the soils themselves. Nutrients are rapidly passed through to only that foliage in close proximity . . . ."

The County and Commission attack the expert testimony as relating only to degradation by indiscriminate, uncontrolled development. The pertinent question, in their view, is whether pygmy forests would be easily degraded by development *as limited in the LUP* through the PD process and other controls. They note testimony that development *so limited* would protect pygmy forest against significant degradation. The Commission made a finding (No. 8) to that effect, anticipating "adverse impacts" but none "substantial enough" to warrant ESHA protection unless rare or endangered plant species were present (fn. 8, *ante*).

We hold that to reformulate the easy-degradation element in that way violates the Coastal Act intent. Habitat which is both (1) "rare or especially

valuable" and (2) "easily disturbed or degraded by human activities and developments" is an ESHA (§ 30107.5). An ESHA "shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas" (§ 30240, subd. (a)). Converting the phrase "easily disturbed or degraded by . . . developments" into "easily disturbed or degraded by [well-controlled] developments," as the Commission would have it, distorts the plain language of the Act.

Moreover, it halves the Act's protections. ESHA status demands (1) protection against significant disruption of habitat values and (2) allowance of resource-dependent uses only (§ 30240, subd. (a)). If ESHA status could be avoided by having only "well-controlled" development—which in essence protects against significant disruption (i.e., protection (1))—the habitat would never be restricted to resource-dependent uses (i.e., protection (2)). That violates the Act, which in demanding protection against "significant disruption" assumes that this protection is *in addition to* the use limitation. The LUP in this case, for example, may provide significant habitat protection, but it allows non-resource-dependent (residential) development in violation of the Act.

Finally, allowing ESHA status to depend on the degree of development protection found in an LUP could result in a habitat enjoying ESHA status in one part of a county coastal zone (e.g., where strict PD controls exist) and not in others. This would be a curious result for a statutory scheme which appears to demand uniform treatment and protections for all ESHA's.

### *"Taking" concerns*

■ The County contends that the Commission was entitled to balance concerns that granting ESHA status might constitute a prohibited taking of private property without just compensation (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 19) and withhold ESHA designation on that basis. Ironically, the Commission itself does not advance this argument. In fact, it urged in the court below that development restrictions were proper concerns but agreed that no taking had yet occurred and that such issues were not ripe, i.e., could not be determined until actual permit applications were made.

We agree that there were no actual takings concerns for the Commission to have "balanced" at the ESHA-designation stage. The County relies on section 30010, which expresses a legislative intent that the Coastal Act *not* grant the Commission or any county the "power to grant or deny a permit in a manner which will take or damage private property for public use, without

the payment of just compensation therefor. . . ." However, that does not support the anticipatory sort of takings balancing advocated by the County. The section appears designed to foreclose any claim that the Coastal Act authorizes takings *without compensation,* a construction which would leave the Act open to a facial challenge. (*Southern Pacific* v. *City of Los Angeles* (9th Cir. 1990) 922 F.2d 498, 505-507; cf. *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 194-195 [87 L.Ed.2d 126, 143-144, 105 S.Ct. 3108].) It does not ask the Commission to balance takings concerns in ESHA decisions.

Further defeating the County's construction, section 30010 speaks of permit-stage actions, not LUP or LCP approvals. ■ This is consonant with the judicial view that takings decisions must await as-applied challenges and are usually not ripe until the permit stage. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." (*Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. 172, 195 [87 L.Ed.2d 126, 144]; see also *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 312, fn. 6 [96 L.Ed.2d 250, 261-262, 107 S.Ct. 2378].) Both the over-regulation *and* just-compensation components of a regulatory taking claim generally require final administrative action as to specific land. (*McDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348-350 [91 L.Ed.2d 285, 293-295, 106 S.Ct. 2561].) If vague, anticipatory takings concerns guided ESHA determinations at the LUP-approval stage, then sections 30107.5 and 30240 might never have force.

Finally, the takings concerns cited by the County are not manifested in the record. The Commission made no findings on point. It observed that ESHA development would be limited to resource-dependent uses (§ 30240, subd. (a)), but it did not articulate actual concern over takings. Findings to support such concerns are therefore lacking. (See fn. 8, *ante.*)

There was some discussion at the September 1985 hearing about the feasibility of using transferred development credits (TDC's) to offset development restrictions, implying a general concern about takings, but the exchange was narrowly focused. When Steven Horn of the State Coastal Conservancy testified that "density transfer" programs were a "difficult and uncertain" approach due to difficulty in finding receiver sites, he was addressing specific density transfers being proposed for other aspects of the LUP. Commission staff analyst Woodruff later clarified that the State Coastal Conservancy had not been invited to consider a program for pygmy forests. A second staff analyst, plus two commissioners, then expressed optimism that a program could be worked out for pygmy areas.

The record strongly suggests, moreover, that a program could be of relatively modest scope for pygmy areas. A limited amount of acreage in the coastal zone is involved, and most of it, according to a County supervisor, is held in small parcels, the largest being about 100 acres. Staff analyst Woodruff estimated that there may be fewer than 10 parcels "entirely within pygmy soil" as mapped. He also noted that pygmy areas years ago had been deemed "uninhabitable and sold at the lowest prices in small acreages," at $500 to $1,000 an acre, to people who could not afford to buy elsewhere. Botanist Robert Sholars concurred, calling those areas formerly the "least desirable residential" ones. He elaborated that "because of severe soil problems in—cluding protracted flooding of a soil during the winter it's an absolutely terrible location for development." Commissioner Wornum called pygmy "in the past the most least [sic] regarded of land," noting the irony of current interest in ESHA status. The scant record we have thus does not suggest high investment expectations or real threatened takings claims by pygmy forest landowners.

Accordingly, we reject "taking" concerns as not relied upon, unripe for decision and undeveloped in the record.

### Coastal development needs

The County invokes what it asserts is statutory authority to balance coastal development needs against the need for ESHA designation. It relies on statements in the Coastal Act that its goals are to protect and maintain the coastal zone environment "where feasible" (§ 30001.5, subd. (a)), to assure "balanced utilization" of its resources "taking into account the social and economic needs of the people of the state" (*id.*, subd. (b)) and to have conflicts between policies resolved "in a manner which *on balance* is the most protective of significant coastal resources" (§ 30007.5, italics added).

The trial court reasoned that the specific two-part test of section 30107.5 left no room for "balancing" economic and environmental interests. However, we need not go so far to uphold the judgment. We can assume arguendo that some such balancing, while usually undertaken at the permit/project stage (e.g. *Gherini* v. *California Coastal Com.* (1988) 204 Cal.App.3d 699, 708 [251 Cal.Rptr. 426]; *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 496 [183 Cal.Rptr. 909]; *City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228, 233-234 [174 Cal.Rptr. 5]; *Bel Mar Estates* v. *California Coastal Com.* (1981) 115 Cal.App.3d 936, 942 [171 Cal.Rptr. 773]), might extend to ESHA decisions at the LUP-approval stage. Generally, the Commission must consider the basic goals of section 30001.5 when deciding whether to certify an LUP. (§ 30512.2, subd. (b); *City of Chula Vista* v. *Superior Court, supra,* 133 Cal.App.3d at p. 481, fn. 3.)

Still, there is nothing in this record showing a particular need to allow coastal development on pygmy forest acreage. Without such evidence, the County is elevating broad policy criteria into specific justification for a particular ESHA decision. The only economic "evidence" cited, in fact, is what the County cites to support the asserted takings concerns, which we have rejected as insubstantial and unripe for serious consideration. Also, the Commission made no finding that the public welfare demands development of pygmy forest areas in the coastal zone (see fn. 8, *ante*), and its decision not to grant ESHA status to *any* such areas would have required a supporting determination that *all* such areas required development, an idea which even the County does not advance. The Commission's action is thus unsupported by findings or evidence, even if economic need was in theory a valid consideration in the ESHA decision.

## DISPOSITION

The judgment is affirmed. Our record shows that the Sierra Club moved concurrently with the judgment for an award of attorney fees (Code Civ. Proc., § 1021.5) and costs, and the parties advise us that they subsequently entered a stipulated judgment for that purpose on November 15, 1991, with this appeal to determine the prevailing party. Having now confirmed Sierra Club's prevailing-party status, we direct the superior court to proceed consistently with the stipulation below and to determine and make an additional award for the successful defense of the judgment on this appeal (cf. *Citizens Against Rent Control* v. *City of Berkeley* (1986) 181 Cal.App.3d 213, 236 [226 Cal.Rptr. 265]).

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied February 16, 1993, and the petition of real party in interest for review by the Supreme Court was denied April 1, 1993.