Filed 7/19/24  Westwood Neighbors etc. v. City of Los Angeles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| WESTWOOD NEIGHBORS FOR SENSIBLE GROWTH,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Respondent;<br><br>BELMONT VILLAGE L.P. et al.,<br><br>    Real Parties in Interest and Respondents. | B329768<br><br>(Los Angeles County Super. Ct. No. 22STCP00646) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Corin L. Kahn for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Amy Brothers, Kathryn C. Phelan, Clarissa Padilla, Deputy City Attorneys; Best

Best & Krieger, Trevor L. Rusin and Ali Tehrani for Defendant and Respondent.

Armbruster Goldsmith & Delvac and Damon P. Mamalakis for Real Parties in Interest and Respondents.

———————————————————————

The City of Los Angeles (City) approved construction on Wilshire Boulevard in Westwood, where Belmont Village, L.P. (Belmont) plans to build an eldercare facility and Westwood Presbyterian Church (Church) plans to build a childcare facility (the Project).[1]  Appellant Westwood Neighbors for Sensible Growth (WNSG) opposes the Project.  The trial court denied WNSG's petition to set aside City's approval of the Project.  (Code Civ. Proc., § 1094.5.)  WNSG challenges City's deviation from zoning laws when it approved the Project.

City need not strictly apply land use regulations if it finds that "practical difficulties or unnecessary hardships" would prevent construction of an eldercare facility.  (Los Angeles Mun. Code, § 14.3.1 (section 14.3.1).  Substantial evidence supports City's decision, which cited expert reports showing that financial hardship and site-specific characteristics justify deviations from land use regulations.  We affirm.

## FACTS AND PROCEDURAL HISTORY
### Nature of the Project

Church owns a 1.62-acre property in the Westwood Corridor containing a church, administrative office, fellowship hall, preschool, and parking lot; the improvements cover

———————————————————————

[1] Belmont and Church are the real parties in interest (RPI's) in this litigation.

95 percent of the site. RPI's intend to preserve the church and demolish the other improvements to build the Project. WNSG writes that Church's property is currently "underutilized."

At the north end of the site, on Wilshire Boulevard, Belmont plans to construct a 12-story eldercare facility with 53 independent living units; 77 assisted living rooms; 46 Alzheimer or dementia care rooms; and amenities for residents. By offering increasing levels of care, the facility will allow residents to age in place. It will have a 99-year lease from Church. The eldercare facility will have a fellowship hall fronting Wilshire for Church's use. A parking lot now covers the area slated for the eldercare facility.

At the south end of the site, near single family dwellings, Church plans to construct a two-story building with a preschool; administrative space; and multipurpose area. Preschool enrollment will increase from its current 80 children to a maximum of 105. There will be surface and subterranean parking, and 70 spaces for bicycles.

**RPI's Apply for Development Permits**

The irregularly-shaped Project site is zoned R-5 (high density with a six-story height limit) and R-1 (single family dwelling). RPI's submitted applications to City in 2018, seeking zoning deviations. Deviations include reduced yard setbacks; increased building height and floor space limits; construction of a preschool and more than 50 dwelling units; and parking that varies from the City's specific plan. RPI's applied for environmental approval under the California Environmental Quality Act (CEQA).

Church's property committee co-chair told City that the Project will endow its work, which includes programs to assist

3

unhoused persons.  Other developers wanted to build luxury condominiums on the site; Church chose Belmont because it has a presence in the community, serves seniors, and will have the least impact on traffic.

## Administrative Approvals

Over WNSG's opposition, City's zoning office allowed the Project's deviations from zoning laws and approved permits for the Project in July 2021—an Eldercare Permit under section 14.3.1, and a Conditional Use Permit for the preschool.  WNSG appealed to the City Planning Commission (CPC).  CPC heard testimony from WNSG and others.  It recommended denial of the appeal in November 2021 and issued letters of determination in December 2021.

The permits allow zoning deviations that increase maximum building height from six to 12 stories and width from 75 feet to 100 feet for the eldercare facility; increase building height from 28 to 33 feet for the childcare facility; reduce parking requirements; reduce yard setbacks to zero; and increase interior common open space.  CPC wrote that City "has historically facilitated the construction of numerous residential high-rise buildings of twenty stories or more along this portion of the Wilshire corridor," including the 24-story "Californian" condominium tower next to the Project site.[2]

WNSG appealed to the City Council.  The City Council adopted the CPC recommendation.  In approving the Project, City found a significant need for an aging-in-place facility, given increasing demand for senior housing.  City found that the

---

[2] A height comparison study shows the eldercare facility will be one of the lower structures on that part of Wilshire.

4

Project falls within the scope of its eldercare ordinance, which facilitates applications for all types of senior housing—independent living, assisted living, skilled nursing, and dementia care.  (§ 14.3.1.)

### Environmental Assessment

No environmental impact report (EIR) was prepared for the Project.  Instead, City found that the Project qualifies as a "transit priority project" (TPP).  Under state law, if a project is a TPP, an agency may prepare a Sustainable Communities Environmental Assessment (SCEA) in lieu of an EIR.[3]

### WNSG Petitions for a Writ of Mandate

WNSG is a nonprofit corporation formed in 2018 by local residents.  In February 2022, WNSG asked the trial court to set aside City's approval of the Project, challenging the deviations from zoning and environmental laws.  WNSG alleged that RPI's did not present evidence of hardship or difficulty if they comply with land use regulations; or that the Project will not cause an adverse impact on street access or circulation in the neighborhood; or that the Project's location, size, height, and operations are compatible with adjacent properties, the neighborhood, or public health, safety and welfare.  WNSG claimed that City's findings are unsupported by substantial evidence, violate state and local law, and that City's approval of the Project was arbitrary and capricious.

### The Trial Court's Ruling

The court found that City's detailed findings support its determination that strict application of land use regulations on

---

[3] The TPP finding and SCEA are the focus of a related appeal, *Zinderman v. City of Los Angeles et al.*, B329765.

5

the Project would result in practical difficulties and unnecessary hardships. The court also rejected WNSG's CEQA claim. It denied WNSG's petition and entered judgment for City and RPI's.

## DISCUSSION

### 1. Appeal and Review

Appeal is taken from the judgment denying WNSG's petition for a writ of mandate. (Code Civ. Proc., § 1094.5.) Agency decisions may be challenged for an abuse of discretion. (*Id.*, subd. (b).) "[A]buse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (*Id.,* subd. (c); *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 (*Topanga*) [administrative record must support the agency's findings and decision]; *Walnut Acres Neighborhood Assn. v. City of Los Angeles* (2015) 235 Cal.App.4th 1303, 1312– 1313 (*Walnut*).)

We "must resolve reasonable doubts in favor of the administrative findings and decision" (*Topanga, supra*, 11 Cal.3d at p. 514), viewing the evidence "in the light most favorable to the agency's findings, drawing all inferences in support of those findings." (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 814.) City's findings " ' " ' "come before us 'with a strong presumption as to their correctness and regularity.' " ' " ' " (*Schreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 558.) " 'We may not substitute our judgment for the City's and reverse because we believe a contrary finding would have been equally or more reasonable.' " (*Walnut, supra,* 235 Cal.App.4th at pp. 1312–1313.)

An agency " 'must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order,' "

6

which "do not need to be extensive or detailed.  ' "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " ' " (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516–517 (*EPIC*).)  "We review the record de novo and are not bound by the trial court's conclusions."  (*Id.* at p. 479.)

### 2.  Exhaustion of Remedies

RPI's argue that WNSG did not exhaust its remedies by raising all claims or legal arguments at administrative hearings. "Judicial review in an administrative mandamus action [under] Code of Civil Procedure section 1094.5 is limited to issues raised in the proceedings before the administrative agency."  (*Dobos v. Voluntary Plan Administrators, Inc.* (2008) 166 Cal.App.4th 678, 688.)  "[T]he exhaustion of remedies doctrine applies equally to questions of law and fact."  (*Robinson v. Department of Fair Employment & Housing* (1987) 192 Cal.App.3d 1414, 1417.)

" 'It was never contemplated that a party to an administrative hearing should withhold any defense . . . or make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court.' "  (*City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1020; *Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 104.)  Courts cannot grant relief "based on a legal theory never presented during the administrative proceedings."  (*NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 337.)

7

Issues WNSG raises here for the first time are the need for a property interest to obtain an eldercare permit; Belmont's lack of a property interest in the Project site; Church's failure to show practical difficulty or financial hardship to support the eldercare permit; City's consideration of financial hardship; the significance of Belmont's role as developer, owner, and operator; the need to "narrowly construe" the grant of an eldercare permit; and the need to judicially interpret City's legislative intent.

After WNSG failed to file a reply brief, we offered it an opportunity to show where, in the 20,431-page administrative record, it raised the factual or legal issues listed above; we warned WNSG that failure to reply would be deemed a concession that the issues were not preserved. WNSG did not reply, giving no answer to respondents' claim of waiver. As a result, we cannot act in excess of our jurisdiction by reaching these issues for the first time on appeal. (*Robinson v. Department of Fair Employment & Housing, supra,* 192 Cal.App.3d at p. 1416.)

### 3. Requirements of Section 14.3.1

City streamlined development of senior housing in 2006, to "create a single process for approvals and facilitate the processing of applications [for] Eldercare Facilities. These facilities provide much needed services and housing for the growing senior population of the City of Los Angeles." (§ 14.3.1.A.) The ordinance allows City to approve eldercare facilities that do "not meet the use, area, or height provisions" of a particular zone. (§ 14.3.1.B.)

City cannot approve an eldercare facility unless the zoning administrator "find[s] that the strict application of the land use regulations on the subject property would result in practical

8

difficulties or unnecessary hardships inconsistent with the general purpose and intent of the zoning regulations." (§ 14.3.1.E.)  The zoning administrator must find that the project provides services to the elderly such as housing, medical services, social services, or long term care to meet citywide demand; does not have an adverse impact on neighboring properties, street access and circulation; is compatible with the scale and character of adjacent properties; and substantially conforms with the purposes, intent and provisions of City's general plan. (§ 14.3.1.E.1–5.)[4]

If City makes a negative finding as to any part of section 14.3.1.E, it cannot approve an eldercare facility.  (*Levi Family Partnership, L.P. v. City of Los Angeles* (2015) 241 Cal.App.4th 123, 134.)  Here, City made *no* negative findings.  On appeal, WNSG challenges only the finding that strict application of the land use regulations on the Project would result in practical difficulties or unnecessary hardships.

**4.  Substantial Evidence Supports City's Findings**

City found that the local senior population is increasing. Residents over age 75 increased at an average of 410 people per year from 2010–2020; this was expected to increase to 1,200 people per year from 2020–2025.  The area has a shortage of senior housing, with a total of only 2,218 units available.  By 2030, 100,000 dementia patients are expected to live in Los Angeles.  Eldercare facility growth was "stagnant," with only 285 units added in the last ten years.

---

[4] We are using the version of section 14.3.1 in effect when RPI's applied for a permit; the ordinance was later amended.

An eldercare facility cannot be approved unless "strict application of the land use regulations on the subject property would result in practical difficulties or unnecessary hardships inconsistent with the general purpose and intent of the zoning regulations." (§ 14.3.1.E.) City concluded that deviations from height, width, setback, and other regulations are justified to meet citywide needs for living accommodations for the elderly, which cannot be achieved within local zoning laws. It noted, "An Eldercare Facility has many specific requirements and operating elements that are not shared with standard multifamily developments and contribute to practical difficulties or unnecessary hardships."

As described below, City's findings identify pertinent evidence of financial hardship and special features of the Project. Coupled with evidence of increasing numbers of senior citizens and its shortfall of senior housing, the findings support City's decision to approve the Project. City's findings are based on detailed, credible reports in the record.[5] (*EPIC, supra,* 44 Cal.4th at pp. 516–517.) WNSG cannot show that City's action "was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law." (*San Franciscans Upholding the Downtown*

---

[5] City relied upon expert reports, including a Financial Feasibility Analysis (FFA) and market feasibility analysis from RCLCO Real Estate Advisors; a landscape architect's report; a shade and shadow study; an air quality and greenhouse gas study; a history resource report; a geology and soils report; an environmental site assessment; a water resources technical report; a utilities memorandum; a noise and vibration report; transportation reports; public service analyses; and a tribal cultural report.

*Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 673–674.)

### a. Financial Hardship

The Project FFA states, "Without the requested building height and zoning deviations, the project could not be built. Therefore, the requests are not designed merely to increase profitability or enhance returns — but instead are essential to enable the construction and viability of an eldercare facility." "[F]inancial hardship may be sufficient for purposes of obtaining a permit under section 14.3.1. to show unnecessary hardship." (*Walnut, supra,* 235 Cal.App.4th at p. 1315.)[6]

City cited the FFA in approving the Project. It found that the FFA analysis of various development scenarios "adequately demonstrates . . . that the development alternatives for a by-right eldercare facility is not viable since the strict application of the land use regulations on the subject property would result in practical difficulties or unnecessary hardships inconsistent with . . . the City's objective to promote and facilitate needed housing and services for the elderly."

WNSG claims that the FFA is based on "assumptions" that lack "supporting facts" and are "conjecture." The claim is incorrect. Conclusions in the FFA are supported by factual detail describing site constraints, rentable area, project development, and operational costs. This, in turn, is supported by exhibits.

As shown in the FFA, eldercare facilities require oversized corridors and elevators to accommodate wheelchairs, walkers, and gurneys, as well as administrative space and public rest

---

[6] WNSG's trial brief stated, "Financial hardship may be sufficient for purposes of obtaining a permit under LAMC §14.3.1," barring its contrary argument on appeal.

11

rooms.  For residents who cannot live alone or travel into town, the facility provides lodging and amenities:  dining areas, kitchens, recreation rooms, an indoor pool, a movie room, lounges, a salon, and laundry and housekeeping services.  Out of 176 units, 123 of them (70 percent) are dependent on food service.  Staff is required for resident care and activities, food service, housekeeping, transport, and administration.

WNSG cites evidence showing that of the facility's 176,580 total square feet, only 104,220 square feet is housing—for independent living, assisted living, and memory care.  This evidence supports RPI's, because it demonstrates how onerous it is to build housing for seniors when much of the building needed to support them is not rentable space.  WNSG writes that this kind of eldercare—which provides "wellness via socialization," not just warehouse conditions for the elderly—is "important" for families and the community at large.

As City found, "Without providing these centralized services, which increase the non-rentable floor area of the Eldercare Facility, a hardship would occur as . . . many of the facility's residents require assistance with normal living activities and cannot live independently."  It concluded, "[W]ithout the proposed residential density . . . the facility cannot operate, nor achieve financial stability when considering staff, medical care, equipment, food, and other costs.  Eldercare projects require substantial support services and common areas to provide a healthy environment for a senior population to age in place with dignity."  The evidence supporting this conclusion is legally sufficient.

### b. Special Features Hardship

City determined that Project site features create a hardship: It is irregular—180 feet wide in its northern section and 88 feet wide farther south. Its odd shape and Gothic Revival church hamper development. The site has split zoning: The northern section is zoned for a six-story eldercare facility "by right," but the southern portion only allows homes. The record shows that Belmont must build alongside Church's sanctuary, which covers a large part of the R-5 lot, and construct parking for Church and the eldercare facility on land zoned R-1.

Given the constraints, City found that the site's "unique lot arrangement . . . is not common among other parcels subject to the same Specific Plan regulations." This "makes strict compliance with building height and width, setbacks, open space, and location, utilization, and access between accessory and main buildings and uses practically difficult or unnecessarily hard." City's findings are not arbitrary, capricious, or unreasonable.

Another hardship is a street that dead ends at the site. As a result, the Project requires a driveway connected to Wilshire Boulevard to allow emergency access—"space that could have potentially otherwise been utilized for a lower scale eldercare building, resulting in a taller eldercare structure." This supports City's hardship finding.

### c. City Was Not Required to Accept WNSG's Report

WNSG submitted a report from The Concord Group (TCG) claiming the Project is financially feasible if built within existing limitations, i.e., a six-story eldercare facility. TCG cited other projects in Southern California for its conclusion.

RCLCO, the company that created the FFA, replied that the costs it cited are specific to this site, which requires

13

preserving Church's sanctuary and building subterranean parking in the narrow part of the site for Church members and the eldercare facility.  Other eldercare facilities did not face similar strictures.  Moreover, TCG wrongly compared the cost of constructing a wood-frame building to that of an eldercare facility requiring costly, noncombustible concrete or steel construction to protect dementia and non-ambulatory residents.

Faced with two reports, City was entitled to accept the FFA submitted by RPI's.  As a CPC member observed during the November 2021 public meeting, TCG "uses general assumptions and not specific data concerning this site, which is very important in order to determine feasibility.  We're not talking about something that's being built 30 miles away."

"When the evidence on an issue conflicts, the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397.)  Courts do not reweigh evidence, and may reverse " 'only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency.' " (*Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610.)  WNSG has not shown that no reasonable person could rely on the FFA.  The TCG report did not refute the FFA's feasibility analysis *for this site*, but only suggested that projects elsewhere in Los Angeles were done differently.  We cannot substitute our judgment for City's.  (*Walnut, supra,* 235 Cal.App.4th at pp. 1312–1313.)

14

### d. The *Walnut* Case is Distinguishable

In *Walnut*, City approved a 60-room eldercare facility, in a neighborhood of single-family homes. (*Walnut, supra,* 235 Cal.App.4th at p. 1308.) City cited the applicant's opinion that it would not be feasible to limit the facility to 16 rooms to conform to zoning laws. (*Id.* at p. 1309.) The trial court overturned City's approval, finding no evidence of unnecessary hardship or citywide demand for senior housing, only that the applicant would have "reduced profits." (*Id.* at p. 1312.)

The court agreed that evidence of unnecessary hardship was absent. "There was no evidence that a facility with 16 rooms could not be profitable," and some "apparently include small homes with four to 10 beds"; nothing showed profit was so low as to amount to unnecessary hardship. (*Walnut, supra,* 235 Cal.App.4th at p. 1315.) The determining factor was, "No report presented either by appellants or by City staff documented the consequence of limiting the development to 16 rooms." (*Ibid.*) The applicant presented no evidence that "the property had special features" and its "only stated basis for an unnecessary hardship" was the need to enhance profit. (*Id.* at p. 1316.) The court wrote, however, that the administrative record "documents the increasing senior population" and citywide demand for more eldercare facilities. (*Ibid.*)

As in *Walnut*, the record in this case documents City's growing senior population and need for housing. Unlike *Walnut*, the FFA demonstrated the consequences of limiting the Project, and City identified "special features" such as the church on the property and irregular lot shape, justifying deviations from local regulations. In particular, the FFA looked at various scenarios and concluded that without deviations, "the project could not be

15

built."  In *Walnut*, "no report" documented any consequence of limiting facility size.  Here, by contrast, the consequence of limiting size would be *no* eldercare facility, exacerbating City's growing shortage of senior housing.  Also, Belmont's facility is among skyscrapers on Wilshire Boulevard, unlike the single-family homes in *Walnut*, allowing greater conformity with the neighborhood.

## DISPOSITION

The judgment is affirmed.  Respondent City of Los Angeles and real parties in interest Belmont Village L.P. and Westwood Presbyterian Church are entitled to recover their costs on appeal from appellant.

NOT TO BE PUBLISHED.




LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.


16