[No. A079015. First Dist., Div. Two. July 27, 1998.]

EDEN HOSPITAL DISTRICT, Plaintiff and Appellant, v.
S. KIMBERLY BELSHÉ, as Director, etc., Defendant and Respondent.

## COUNSEL

Seyfarth, Shaw, Fairweather & Geraldson and Thomas Joel Weiss for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Charlton G. Holland, Assistant Attorney General, Stephanie H. Wald and Ralph M. Johnson, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**KLINE, P. J.**—Eden Hospital District appeals from the trial court's denial of a petition for writ of mandate by which the hospital district sought to reverse a decision by the Director of the Department of Health Services regarding payment for services rendered to Medi-Cal patients. Appellant contends the administrative decision was not supported by substantial evidence.

### STATEMENT OF THE CASE AND FACTS

Under the Medi-Cal program, the amount hospitals are reimbursed for inpatient services provided to Medi-Cal recipients is limited by formulas set forth in the regulations implementing the program. Pursuant to statute and regulations, during the years 1989 and 1990, appellant received interim payments for inpatient services rendered to Medi-Cal patients. Thereafter, the department audited appellant's cost reports and determined, after application of the "maximum inpatient reimbursement level" (MIRL)—a limitation on reimbursement calculated by multiplying an "all-inclusive rate per discharge" by the number of Medi-Cal discharges in a given year—that appellant had received overpayments for these years.

Appellant was informed in August 1993 that the department had determined its liability for the years 1989 and 1990 to be $705,459.72 and $531,542.07, respectively. Appellant filed a request for an administrative adjustment. The department did not respond and by letter of December 3,

1993, appellant requested an administrative hearing. Settlement discussions led to agreement on some of the disputed issues and a reduction of appellant's MIRL liabilities, and the matter proceeded to an administrative hearing.

At the hearing, appellant argued its high costs for 1989 and 1990 resulted primarily from three factors: Because it was a noncontracting hospital in a closed area its Medi-Cal intake was of emergency or otherwise acutely distressed patients; its operation of a "level two" trauma center increased its intake of acute patients requiring more intensive services; and changes in county policy caused an increase in its population of gravely disabled or dangerous psychiatric patients.

According to evidence presented at the administrative hearing, for Medi-Cal purposes appellant was a noncontracting hospital in a closed area, meaning it could treat Medi-Cal patients only as emergencies and was required to transfer them after they were stabilized. The contract-based reimbursement system for Medi-Cal came into existence in about 1983. In 1985, appellant decided to upgrade its facility, which then operated a certified emergency room, to become a level two trauma center. The main difference between a certified emergency room and a level two trauma center is in the availability of personnel and services: A level two trauma center is required to have an in-house trauma surgeon and anesthesiologist 24 hours a day, an orthopedic and neurosurgeon standing by and available within 30 minutes, and an operating room on hold 24 hours a day. In January 1987, appellant entered into a contract with Alameda County to provide services as a trauma center and began operations as such. Once the trauma center was operational, all trauma patients from southern Alameda County were brought to Eden Hospital; previously, appellant had received ambulances from a smaller area.

Appellant offered involuntary psychiatric treatment during the 1980's. Prior to late 1987/1988, involuntary psychiatric patients would be taken to the nearest basic emergency room and subsequently transferred if the facility did not have the capability to handle them. In late 1987/1988, the county changed its protocols to require these patients be taken only to facilities designated to handle these patients under Welfare and Institutions Code section 5150. This increased the number of involuntary psychiatric patients received by appellant. In late 1989 or early 1990, appellant increased its number of psychiatric beds from 17 to 33, with a corresponding decrease in the number of pediatric or medical-surgical beds.

Margaret Green, a registered nurse who had been the vice-president and senior vice-president for patient care services at Eden Hospital since 1980,

testified that because appellant had never had a Medi-Cal contract, it received Medi-Cal patients as emergencies and was required to attempt to transfer them once they were stable. Green testified that the intensity of services required in the "golden hour" immediately after injury—the critical period in terms of survival rates—was very high. Once the patient was sufficiently stabilized for transfer, the intensity of services required in the receiving institution would be significantly lower than in the prestabilization period. Green testified that in the period after appellant became a trauma center, there was much more violent trauma than when it had done its feasibility study, as well as a higher incidence of unemployed, uninsured patients. Green also testified that there was an increase in severity of psychiatric patients received by appellant in 1989, including patients who were very difficult to place, and that the "psychiatric patient population generally is heavily weighted with Medi-Cal enrollees." Despite appellant's efforts, most of the time these psychiatric patients could not be transferred to appropriate facilities and remained hospitalized at Eden for weeks or even months.

On cross-examination, Green acknowledged that the costs associated with becoming a trauma center—the on-site surgeon, anesthesiologist and equipment—were not new in 1989 as compared with 1988. Green testified that appellant averaged three to four trauma patients per twenty-four-hour period.

Dr. Brian Walker, who was the medical director of appellant's trauma service from 1985 to 1991, testified that with respect to the 15 most expensive Medi-Cal cases for each of 1989 and 1990, the care given was appropriate, necessary and efficient, no unnecessary or medically inappropriate procedures were performed, and there were no unnecessary hospitalizations. Among the problems appellant faced with these patients, according to Walker, was the unavailability of beds at other facilities even after patients were sufficiently stable for transfer. With psychiatric patients, the situation was complicated by the need for the hospital to pursue conservatorship proceedings. Walker acknowledged that this need for conservatorship proceedings for involuntary psychiatric patients had existed in the years before 1989. Walker testified that after the institution of the trauma center, both the volume and the acuity of patients' injuries increased. He further testified that the intensity of services required for trauma patients is greatest in the first day or so after injury.

Withbert Payne, president of a health care reimbursement firm, testified, among other things, that while Medi-Cal patients had had shorter hospital stays than non-Medi-Cal patients in 1980 and 1981, in 1989 and 1990 the hospital stays of Medi-Cal patients were 41 and 20 percent longer, respectively, than those of non-Medi-Cal patients. Payne also performed a regression analysis, comparing actual discharge costs in 1989 and 1990 with what

those costs should have been by extrapolation from 1980, 1981 and 1982 (when "base year type Medi-Cal patient[s]" were treated). He testified this analysis showed the costs for 1989 and 1990 were much higher than they should have been by extrapolation from the earlier years.

The department presented the testimony of Terry Childress, a research analyst whose duties included reviewing appeals and administrative adjustments requesting relief from the maximum inpatient reimbursement level. Childress noted that appellant had no MIRL liability for the years 1981 through 1986 or for 1988. Comparing data from 1988, 1989 and 1990, Childress found that the percentage of trauma discharges to total Medi-Cal discharges was lowest in 1989 and highest in 1990, while appellant's liability—the amount exceeding covered trauma charges—was highest in 1989, in the middle in 1990, and zero in 1988. Childress concluded there was no correlation between the percentages of trauma patients and actual liabilities incurred by the hospital. With respect to Payne's testimony regarding the length of Medi-Cal patients' hospitalizations, offered by appellant to show it was treating more acute Medi-Cal patients in 1989 and 1990, Childress noted that in two of the years for which appellant had no MIRL liability, 1984 and 1986, its ratio of Medi-Cal length of stay to non-Medi-Cal length of stay was even higher than in 1989 and 1990.[1]

After the hearing, appellant's appeal was granted with respect to a matter not at issue here (the department was directed to modify its formula regarding patients with longer than average hospital stays) and otherwise denied. As a result of its administrative appeal, appellant's liability was reduced to a total of $337,514 for the years 1989 and 1990. Appellant filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) on March 12, 1996, seeking to compel the department to issue a new decision granting appellant's administrative appeal in full. On May 16, the petition was denied, the trial court finding the administrative decision supported by substantial evidence.

Appellant filed a timely notice of appeal on June 19, 1997.

### Discussion

Under the federal Medicaid Act, states are required to reimburse hospitals at rates that are "reasonable and adequate to meet the costs which must be

---

[1] The length of stay ratio was 72 percent in 1984, 42 percent in 1986, 8 percent in 1989 and 41 percent in 1990.

Appellant suggests in its reply brief that Childress acknowledged his own testimony did not "evidence[ ] anything." What Childress actually said is that he did not believe appellant's length of stay data "evidences anything."

incurred by efficiently and economically operated facilities . . . ." (42 U.S.C. former § 1396a(a)(13)(A).) Prior to the enactment of this standard, states were required to reimburse the "reasonable cost" of hospital services, defined as "the cost of services *actually* incurred by a hospital provider and otherwise allowable under Medicare." (*Robert F. Kennedy Medical Center* v. *Belshé* (1996) 13 Cal.4th 748, 751-752 [55 Cal.Rptr.2d 107, 919 P.2d 721], italics in original; see *Wilder* v. *Virginia Hospital Assn.* (1990) 496 U.S. 498, 505 [110 S.Ct. 2510, 2515, 110 L.Ed.2d 455].) The new standard was adopted "in an effort to contain spiraling Medicaid costs for hospital services." (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* at p. 751; *Wilder* v. *Virginia Hospital Assn., supra,* 496 U.S. at p. 506 [110 S.Ct. at pp. 2515-2516].) States were permitted "to develop alternate methodologies to limit reimbursement based upon the costs that would have been incurred by an efficient and economically operated facility, even if a provider's actual costs were greater." (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* at p. 752; *Wilder* v. *Virginia Hospital Assn., supra,* 496 U.S. at pp. 506-507 [110 S.Ct. at p. 2516].)

Under the regulations implementing the Medi-Cal program, the maximum in patient reimbursement limit for hospital inpatient services is the lesser of "(1) [c]ustomary charges[,] [¶] (2) [a]llowable costs determined in accordance with applicable Medicare standards and principles of reimbursement[, and] [¶] (3) [a]ll-inclusive rate per discharge." (Cal. Code Regs., tit. 22, § 51536, subd. (a).)[2] The "all-inclusive rate per discharge" is the "hospital specific, all-inclusive rate per Medi-Cal discharge which, when multiplied by the number of Medi-Cal discharges . . . in the hospital's accounting year, determines the total dollar limit on reimbursable cost for that accounting year." (§ 51536, subd. (b)(6).) The all-inclusive discharge rate is calculated by annually adjusting a rate per discharge established for a hospital's "base year," the most recent hospital accounting year ending before the effective date of the regulation. (§ 51536, subds. (a), (f)-(i).) In calculating this maximum per patient rate, ". . . the provider is given full credit for certain costs, such as rents and property taxes (§ 51536, subd. (b)(7)), but not for other costs (such as costs of services that have increased significantly over those incurred in prior years). The regulation also controls the amount that the all-inclusive rate per discharge may increase above the rate allowed in prior years. (§ 51536, subds. (c)-(i).) The rate must be updated annually and must incorporate data based upon a series of price indicators that may be derived from a variety of sources, including the consumer price index. (§ 51536, subd. (g).)" (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 752.) Additionally, hospital reimbursement may not exceed the 60th percentile rate per discharge of the hospital's "peer group," a

[2]All further undesignated section references will be to the California Code of Regulations, title 22.

classification "that combines individual hospitals in a unit on the basis of similar or common characteristics." (§ 51539, subd. (b); *Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 752.)[3]

A hospital may request an administrative adjustment to the all-inclusive reimbursement rate and peer group limitation. (§§ 51536, subd. (j), 51539, subd. (d)(3)(A).) The issues that may be resolved through an administrative adjustment regarding the all-inclusive reimbursement rate are "addition of new and necessary services," "[c]hanges in case mix," "[i]nappropriate calculation of fixed and variable costs," "use of incorrect data or an error in calculations," and "[o]ther items affecting hospital costs." (§ 51536, subd. (j)(2).) In seeking an administrative adjustment of the reimbursement rate, the provider must demonstrate one or more of the following: "1. Costs for which additional reimbursement is being requested are necessary, proper, and consistent with efficient and economical delivery of covered patient care services. [¶] 2. Incorrect data were used. [¶] 3. An error was made in the rate calculation. [¶] 4. More appropriate data are available." (§ 51536, subd. (j)(3)(B).) The department's decision on an administrative adjustment may be appealed. (§§ 51536, subd. (k), 51539, subd. (d)(3).)

◼ In ruling on a petition for writ of administrative mandamus, the trial court reviews the administrative record to determine whether the agency's decision is supported by substantial evidence. (*Sierra Club* v. *California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779]; *California State Auto. Assn. Inter-Ins. Bureau* v. *Garamendi* (1992) 6 Cal.App.4th 1409, 1418 [8 Cal.Rptr.2d 366].) The court must consider all relevant evidence in the record, but " '[i]t is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency.' " (*Sierra Club*

---

[3]During a given year, hospitals receive interim payments "based upon the hospital provider's historical rates of Medi-Cal reimbursement for costs." (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 753; § 51536, subd. (c)(2).) At the end of the year, the hospital submits cost reports to the department, which makes a "tentative settlement," determining the liabilities owed after calculation of the all-inclusive rate per discharge, a limitation on reimbursement which will be explained in the text. This tentative settlement uses data supplied by the hospital for the accounting year which has not been audited by the department. (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 753; § 51536, subd. (b)(9).) The department may audit the hospital's cost report within three years of the close of the period covered by the report (Welf. & Inst. Code, § 14170); the audit report may be appealed. (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 758; Welf. & Inst. Code, § 14171; § 51016 et seq.) The department then completes a final settlement based on the audited data (§ 51536, subd. (b)(10)); this final settlement is subject to appeal. (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 758; Welf. & Inst. Code, § 14171; §§ 51536, subd. (k), 51539, subd. (d).)

v. *California Coastal Com., supra,* 12 Cal.App.4th at p. 610, italics omitted, quoting *McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 186 [131 Cal.Rptr. 462].) The standard of review for this court is identical: We, too, determine whether substantial evidence supports the administrative decision. (*Sierra Club* v. *California Coastal Com., supra,* 12 Cal.App.4th at pp. 610-611; *Sierra Club* v. *California Coastal Com.* (1993) 19 Cal.App.4th 547, 557 [23 Cal.Rptr.2d 534]; *Intercommunity Medical Center* v. *Belshé* (1995) 32 Cal.App.4th 1708, 1711 [39 Cal.Rptr.2d 43].) "Where no challenge to the factual findings is made, the appellate court need only determine whether the Department's ruling was so arbitrary and capricious as to amount to an abuse of discretion." (*Intercommunity Medical Center* v. *Belshé, supra,* 32 Cal.App.4th at p. 1711.)

The administrative law judge found that appellant was a noncontracting hospital in a closed area and could treat Medi-Cal patients only on an emergency basis; that appellant operated a level two trauma center and expanded its 17-bed locked psychiatric unit to 33 beds in 1989; that a level two trauma center is required to have an anesthesiologist, a trauma surgeon and specially trained supporting staff on duty at all times and to have an immediately available operating room for trauma patients; and that during the years at issue, appellant "served Medi-Cal patients who were more acute than the average patient served by [appellant] and more acute than the average Medi-Cal patient."

As relevant to the present appeal, the administrative law judge found appellant had not met its burden of proving it was entitled to an administrative adjustment based on changes in its population (due to its status as a noncontracting hospital in a closed area, its operation of the level two trauma center, and its admission of involuntary psychiatric patients). The decision specifically rejected two items of appellant's evidence, a regression analysis by which Payne compared appellant's actual costs with what costs should have been by extrapolation forward from 1980, 1981 and 1982 (the reliability of which was questioned by the decision) and appellant's case mix calculation (which the decision found utilized an unbalanced equation). The decision also declined to view appellant's trauma unit or psychiatric services as "new and necessary services" for which relief could be granted.

Turning to the latter point first, there is plainly substantial evidence to support the administrative determination. Under section 51536, subdivision (j)(2)(A), one of the items that "may be resolved through an administrative adjustment" is "[t]he addition of new and necessary services." According to the evidence adduced at the hearing, the start-up costs for the trauma unit were incurred prior to its beginning operations in 1987 and the equipment,

space, and staffing of the unit have not changed significantly since then. Similarly, while appellant added psychiatric beds in late 1989/early 1990 (with a corresponding decrease in pediatric or medical-surgical beds), it had offered treatment for involuntary psychiatric patients for many years before the years at issue here. Following the decision of a different administrative law judge in a prior appeal by appellant concerning 1987, the decision here concluded that the institution of a level two trauma center and addition of psychiatric beds were upgrades of existing services and not additions of new and necessary services. Appellant does not argue this conclusion is unsupported.

Appellant does argue that the trial court incorrectly interpreted section 51536 as requiring appellant to prove the services for which it requested MIRL relief were "new" as well as "necessary." The regulation refers to "new" services in subdivision (j)(2)(A), which, as indicated above, states that one of the items that may be resolved through an administrative adjustment is the "addition of new and necessary services." Subdivision (j)(3)(B), however, provides that a request for an administrative adjustment must "specifically and clearly identify the issue and total dollar amounts involved," and that "[t]he hospital shall demonstrate at least one of the following: [¶] . . . [¶] 1. Costs for which additional reimbursement is being requested are necessary, proper, and consistent with efficient and economical delivery of covered patient care services." Appellant takes the position that as long as it makes the showing required by subdivision (j)(3)(B), it need not also prove the services in question were "new."

Appellant portrays the record of the trial court hearing as demonstrating the court believed appellant was required to show the services for which it sought relief were new as well as necessary. At the hearing, the trial court indicated appellant had proved the treatment given to particular patients during the years in question was medically necessary and efficient; appellant argued it was not required to prove the services were "new and necessary"; and the department argued appellant had failed to meet its burden of demonstrating "increased cost that would have been incurred by an efficient, economically-operated facility" associated with the expanded psychiatric facility or institution of a level two trauma center. At the end of the hearing, the court stated: "[I]f [the department's attorney] is right, he wins. I mean, if the legal standard is as he says it is, he wins. If it's as you say it is, then you're right. You win on substantial evidence. This is a legal issue, however the law comes out, if there is substantial evidence to support ruling for you or for him."

Appellant interprets the trial court as saying the department would win if the legal standard required a showing that the services for which appellant

sought relief from the MIRL were "new." If this interpretation is correct, the trial court was wrong. Subdivision (j)(2) of section 51536 lists five issues that may be resolved through an administrative adjustment, of which "[t]he addition of new and necessary services" is only one. The fifth enumerated issue, "[o]ther items affecting hospital costs," is broad enough to encompass many issues that have nothing to do with addition of "new" services.

The trial court's written decision did not say anything about a requirement of proving "new" services. Rather, the decision simply stated that appellant "failed to meet its burden below and the decision of the respondent is supported by substantial evidence." An alternate interpretation of the court's remarks at the hearing is that the court had moved beyond the "new" issue and was saying the department would win if the legal standard required appellant to prove it had incurred increased costs associated with its psychiatric and trauma services that would have been incurred by an efficient and economically operated facility, while appellant would win if it was required only to show that the costs for which it was seeking reimbursement were "necessary, proper and consistent with efficient and economical delivery of covered patient care services." (§ 51536, subd. (j)(3)(B).) In any event, any misinterpretation by the trial court of the proper legal standard is irrelevant, as the standard for review requires this court to review the *administrative* decision to see if it is supported by substantial evidence. (See *Sierra Club* v. *California Coastal Com., supra,* 12 Cal.App.4th 602, 610-611.)

In addition to rejecting appellant's "new and necessary" argument, the administrative law judge found appellant had not met its burden of proving it was entitled to an administrative adjustment based on changes in its population. This is really the heart of the appeal, as appellant does not attempt to show the psychiatric and trauma services were new. Appellant urges it treated difficult and expensive Medi-Cal patients because its status as a noncontract hospital in a closed area meant it did not treat routine Medi-Cal patients but only emergency ones; its trauma center drew trauma cases from all of southern Alameda County rather than the smaller geographical area from which it had received emergency cases before institution of the trauma center; it received more acute involuntary psychiatric patients due to a change in county protocol concerning the facility to which these patients should be taken; and these patients often could not be transferred to appropriate other facilities.

As to appellant's first point, the administrative decision noted that the change in appellant's patient pool due to its being a noncontract hospital occurred some years before 1989 and 1990. Specifically, the contract-based reimbursement system for Medi-Cal came into existence in about 1983, yet

appellant had MIRL liabilities for only one year between this time and 1989 (1987), including no MIRL liability in 1988, when appellant incurred a comparable proportion of trauma costs. Similarly, with respect to the involuntary psychiatric patients, while the county protocols changed in late 1987/1988, and at least some of the problems resulting in long stays for involuntary psychiatric patients existed in the years before 1989, appellant had no MIRL liabilities in 1985, 1986 or 1988. As for the increase in trauma patients received at Eden, Childress testified there was no correlation between the percentages of trauma patients and actual liabilities incurred by the hospital. Childress's comparison of data from 1988, 1989 and 1990, indicated the percentage of trauma discharges to total Medi-Cal discharges was lowest in 1989, when appellant's MIRL liability was highest; the percentage of trauma discharges was highest in 1990, when the MIRL liability was in the middle; and the percentage of trauma discharges was in the middle in 1988, when appellant's MIRL liability was zero. With respect to Payne's testimony regarding the length of Medi-Cal patients' hospitalizations, offered by appellant to show it was treating more acute Medi-Cal patients in 1989 and 1990, Childress noted that in two of the years for which appellant had no MIRL liability, 1984 and 1986, its ratio of Medi-Cal length of stay to non-Medi-Cal length of stay was even higher than in 1989 and 1990.[4]

Appellant argues on appeal that the administrative decision did not cite any evidence indicating inefficient treatment of the 1989 and 1990 patients and mentioned only the "claimed weakness of the least important evidence propounded by [appellant], a cost trend graph with too few data points to be validated by statistical theory." Notably, appellant does not challenge the decision's conclusion that this piece of evidence—Payne's regression analysis—was unreliable, but only states it was appellant's "least important evidence." While the department did not purport to show appellant offered anything but reasonable care to the patients it treated in 1989 and 1990, however, the above discussed evidence presented by the department shows that appellant failed to establish a critical part of its case. Reasonable as the care it provided may have been, appellant failed to demonstrate that the increased costs for which it was seeking reimbursement in fact resulted from the factors upon which it relied, or that these costs would have been incurred by an efficient and economically operated hospital.

■ The essence of appellant's argument on appeal is that because it produced unrebutted evidence that the services rendered to the most expensive patients treated in 1989 and 1990 were medically necessary, reasonable,

---

[4]The length of stay ratio was 72 percent in 1984, 42 percent in 1986, 8 percent in 1989 and 41 percent in 1990.

and did not involve unnecessary procedures or hospitalizations, it is entitled to full reimbursement for its costs. As explained in *Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at pages 751-752, however, federal law requires that states reimburse hospitals only for "costs that would have been incurred by an efficient and economically operated facility, even if a provider's actual costs were greater." This standard was adopted to replace the previously existing requirement that providers be reimbursed for "reasonable" costs in "an effort to contain spiraling Medicaid costs for hospital services." (*Id.,* at p. 751.) In keeping with the current standard, section 51536, subdivision (j)(3)(B), requires a hospital to show not only that its costs were necessary and proper, but that they were "consistent with efficient and economical delivery of covered patient care services."

In the present case, appellant presented unrebutted evidence that the care provided to the 30 most expensive patients in 1989 and 1990 was medically necessary and appropriate according to the standard of care applicable to the hospital, and that no unnecessary procedures or hospitalizations occurred. Dr. Walker also testified the care given was "efficient," testimony which appellant takes to satisfy the requirement that it demonstrate its costs were "consistent with efficient and economical delivery" of services. Walker's testimony, however, was both conclusory and ambiguous: His references to "efficiency" were never explicitly tied to financial costs as opposed to efficiency in the manner services were provided.[5] Appellant points to no other evidence demonstrating the services it rendered were "consistent with efficient and *economical* delivery of covered patient care services." To the extent it did not prove the costs it incurred would have been incurred by an "efficient and economically operated facility" (*Robert F. Kennedy Medical Center* v. *Belshé, supra,* 13 Cal.4th at p. 752; 42 U.S.C. former § 1396a(a)(13)(A)), appellant was not entitled to reimbursement even if the care it provided was medically necessary and proper.[6]

Moreover, in order to obtain an administrative adjustment, appellant was required to do more than satisfy section 51536, subdivision (j)(3)(B), alone.

---

[5]Walker testified he did not find evidence of "unnecessary care or inefficient care" given to one patient about whom he testified; that the care to two others was "medically necessary, appropriately provided" and "appropriate and necessary;" and that the care given to the 30 patients generally was "appropriate care, it was necessary care, and it was provided in a timely and efficient manner."

[6]Similarly, appellant failed to show the department's denial of its request for an administrative adjustment violated federal law, which at all times relevant to this case required state plans for medical assistance to provide payment for hospital services "which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." (42 U.S.C. former § 1396a(a)(13)(A).)

As a preliminary matter, appellant was required to show some "item[] affecting hospital costs" (or other factor enumerated in section 51536, subdivision (j)(2)) accounted for its increased costs in 1989 and 1990. This is apparent from the structure of the regulation, which first identifies the issues that may be addressed by means of an administrative adjustment—including, as relevant to this case, the "addition of new and necessary services," "changes in case mix," and "other items affecting hospital costs"—and then requires the hospital to demonstrate at least one of a number of factors, including that the costs are "necessary, proper, and consistent with efficient and economical delivery of covered patient care services." (§ 51536, subd. (j)(2), (3)(B).) Here, appellant attempted to make the required showing by showing the acuteness of the Medi-Cal patients it served increased during the years in question. The department presented evidence, however, that the factors appellant relied upon to explain this change in patient pool were in place before the years in question, with no apparent impact on appellant's MIRL liabilities. This evidence tended to show the all-inclusive rate per discharge applied to appellant was sufficient to account for the costs associated with the services at issue and constituted substantial evidence to support the administrative decision that appellant had not met its burden of proving increased costs due to the factors upon which it relied.[7]

---

[7]Appellant relies upon *Whispering Pines Mobile Home Park, Ltd.* v. *City of Scotts Valley* (1986) 180 Cal.App.3d 152 [225 Cal.Rptr. 364], as a case holding an administrative decision could not stand where the only evidence in the record contradicted the decision. In that case, a rent control hearing resulted in a determination that a rate of return between 7.61 and 8.75 percent was fair although the only evidence was that a fair rate was at least 9 percent. In appellant's view, the present case is similar in that appellant presented evidence of reasonable and efficient treatment of its patients and the department did not present evidence to the contrary. As explained in the text, however, appellant's showing was insufficient to fully make its case and the department did present evidence to make this point. Accordingly, this is not a case where the administrative decision was contrary to the only evidence presented at the hearing.

Appellant also suggests the substantial evidence test does not apply at all to this case, because the administrative law judge made no finding adverse to appellant's claim that the services rendered were medically necessary and efficient and an administrative decision may not be upheld on grounds upon which it did not rely. With regard to the latter point, appellant cites *Vista Hill Foundation, Inc.* v. *Heckler* (9th Cir. 1985) 767 F.2d 556. Respondent, by contrast, urges California law permits administrative decisions to be upheld on the basis of implied findings, citing *Topanga Assn. for Scenic Community* v. *County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1363 [263 Cal.Rptr. 214], and *Dore* v. *County of Ventura* (1994) 23 Cal.App.4th 320, 328 [28 Cal.Rptr.2d 299]. Neither of respondent's cases deals with implied findings: *Dore* involved an agency's incorporation of findings made by others and *Topanga* involved findings in the language of an ordinance. Putting aside this debate, however, we do not uphold the department's decision on a ground not relied upon; as previously stated, we uphold the department's conclusion that appellant's evidence was insufficient to meet its burden of proof.

The judgment is affirmed.

Haerle, J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 14, 1998.