[No. B155748. Second Dist., Div. Seven. Sept. 4, 2002.]

SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, v. PUBLIC UTILITIES COMMISSION, Respondent.

[And four other cases.*]

*County of Los Angeles v. Public Utilities Com. (No. B157031); California Cogeneration Council v. Public Utilities Com. (No. B157038); Independent Energy Producers Assn. v. Public Utilities Com. (No. B157773); Central Hydroelectric Corp. v. Public Utilities Com. (No. B160717).

## COUNSEL

Stephen E. Pickett, Russell C. Swartz and James B. Woodruff for Petitioner Southern California Edison Company.

Lloyd W. Pellman, John F. Krattli, Lillian D. Salinger and Roger A. Berliner for Petitioner County of Los Angeles.

White & Case, Jerry R. Bloom, Dan Woods, Joseph M. Karp and Karen E. Edmonson for Petitioner California Cogeneration Council.

Ellison, Schneider & Harris and Douglas K. Kerner for Petitioner Independent Energy Producers Association.

Dale W. Mahon for Petitioner Central Hydroelectric Corporation.

Gary M. Cohen, Mary F. McKenzie and Amy C. Yip-Kikugawa for Public Utilities Commission of the State of California.

OPINION

MUNOZ, J.*—We issued a writ of review in this case to consider the lawfulness of certain rulings by the Public Utilities Commission (Commission), revising a formula adopted pursuant to Public Utilities Code section 390, subdivision (b), which is used to determine the amount petitioner Southern California Edison (Edison) is required to pay certain providers of small amounts of electricity. We affirm the decisions of the Commission except as modified.

### PROCEDURAL BACKGROUND

On March 27, 2001, in Decision No. 01-03-067[1] (Decision) the Commission instituted a new formula by which to measure a portion of a utility's short run avoided costs (SRAC). (Cal.P.U.C. Decision Modifying Decision 96-12-028 (Mar. 27, 2001) Dec. No. 01-03-067.) Edison's petition for rehearing was denied by the Commission in Decision No. 01-12-025, on December 11, 2001. (Cal.P.U.C. Order Modifying Decision 01-03-067 and Denying Rehearing, as Modified (Dec. 11, 2001) Dec. No. 01-12-025.) The petitions for rehearing of the other parties, who are essentially members of a trade association of owners or owners of small electric generation facilities, were denied in Decision No. 02-02-028 on February 8, 2002. (Cal.P.U.C. Order Granting Limited Rehearing of Decision 01-03-067 filed by QF Parties (Feb. 7, 2002) Dec. No. 02-02-028.) Petitions for writ of review were filed in this court by Edison, Los Angeles County (County) and the California Cogeneration Council (CCC). (Pub. Util. Code, § 1756.) Petitioner, Independent Energy Producers Association (IEPA) filed its petition for review in the Third District. The Supreme Court ordered that matter transferred to this court for consideration along with the other petitions concerning Decision No. 01-03-067, Decision No. 01-12-025 and Decision No. 02-02-028. (Pub. Util. Code, § 1756.)

The Central Hydroelectric Corporation (CHC) was not a party to the original proceedings, but it became a party when it filed a petition for rehearing of the Decision. (Pub. Util. Code, § 1731, subd. (b).) Thereafter, CHC filed a petition for review directly with the Supreme Court. That court ordered the CHC petition transferred to this court for disposition. We then ordered the CHC petition consolidated with the other pending petitions.[2]

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]The Commission numbers its decisions and rulings by year and month followed by the ruling or decision number, and refers to them as D.00-00-00. In this opinion, we use the same format, as a shortened citation, except that we replace D. with Decision.

[2]The Supreme Court transferred this matter to this court on July 31, 2002. However, this court did not receive the record until August 13, 2002, four days after the August 9, 2002 oral arguments on the other four petitions. Because the arguments in the CHC petition appeared to

FACTS

1. *Federal History and Regulations*

In 1978 Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA). (Pub.L. No. 95-617 (Nov. 9, 1978) 92 Stat. 3117.) PURPA was passed in response to the energy crises of the 1970's, and was prompted in part by efforts to lessen this country's dependence on foreign energy. In order to prompt the development of more efficient means of providing energy, Congress provided certain benefits and exemptions for qualifying cogeneration facilities[3] and small power production facilities (QF's).[4] The concern of Congress in regards to QF's was stated by the Supreme Court in *FERC v. Mississippi* (1982) 456 U.S. 742, 750-751 [102 S.Ct. 2126, 2132-2133, 72 L.Ed.2d 532] as follows: "Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development." (Fn. omitted.)

In order to alleviate these concerns, section 210 of PURPA[5] ordered the Federal Energy Regulatory Commission (FERC) to implement the congressional intent and specifically "to encourage cogeneration and small power production." The FERC subsequently adopted those rules, which were codified as 18 Code of Federal Regulations part 292 et seq. (2002). The regulations require electrical utilities to purchase energy or capacity made available by a QF (18 C.F.R. § 292.303(a) (2002)) at prices equivalent to the utilities' "avoided costs." (18 C.F.R. § 292.304(b) (2002).) "Avoided costs" are defined as "the incremental costs to an electrical utility of electrical energy or capacity or both which, but for the purchase from the qualifying facility or facilities, such utility would generate itself or purchase from another source." (18 C.F.R. § 292.101(b)(6) (2002).) In other words,

---

be the same as in the other petitions, this court sent out a notice notifying all parties that it was proposing to accept the briefing and argument in the previously submitted matters as the briefing and argument in the CHC petition and issue a consolidated opinion disposing of all five petitions. All parties were given five days to object to the proposed consolidation. When no objections were received, this court ordered the CHC petition consolidated with the other petitions.

[3]A "cogeneration facility" is a facility that produces energy and steam or forms of useful energy (such as heat) which can be used for industrial, commercial, heating or cooling purposes. (See 16 U.S.C.A. § 796(18)(A).)

[4]A "Small Power Production Facility" is an eligible solar, wind, waste, or geothermal facility which produces electricity. (See 16 U.S.C.A. § 796(17).)

[5]Title 16 United States Code Annotated section 824a-3.

"avoided cost is not measured by what the utilities are paid when they sell energy, but instead what they must spend to produce or procure [that] energy in the absence of QFs." (Cal.P.U.C. Opinion In the Matter of the Application of San Diego Gas & Electric Co. (Mar. 4, 1999) Dec. No. 99-03-021, p. 11 [1999 Cal.P.U.C. Lexis 384].) The regulations further provide that the costs paid are to be fair and reasonable to the electric consumer of the electric utility and in the public interest and not be discriminatory against the QF's. (18 C.F.R. § 292.304(a) (2002).) The same regulation also provides that public utilities need not pay QF's more than the avoided costs. (*Ibid.*)

## 2. *The Effect of Deregulation in California*

The cost of natural gas was one factor considered in determining the avoided cost of the various utilities. Between 1980 and 1996, the Commission had used an administratively determined avoided cost price, but that methodology had been "fraught with contention." (See Dec. No. 96-12-028, *Re Biennial Resource Plan Update* (1996) 69 Cal.P.U.C.2d 546, 552; see also Dec. No. 91-10-039, *Re Biennial Resource Plan Update* (1991) 41 Cal.P.U.C.2d 484.)

In 1996 the California Legislature enacted Assembly Bill No. 1890 (1995-1996 Reg. Sess.), which restructured and deregulated the electrical industry. (Stats. 1996, ch. 854, § 10, eff. Sept. 24, 1996.) As part of the restructuring process an Independent System Operator (ISO) was created. (Pub. Util. Code, §§ 330, subd. (m), 345-352.5.) The ISO was under and subject to the jurisdiction of the FERC (Pub. Util. Code, § 346) and assumed responsibility for scheduling the transmission of power throughout its statewide "control area." (Pub. Util. Code, § 330, subd. (m).) The Legislature also created a Power Exchange (PX), which was to work in conjunction with the ISO. The purpose of the PX was to provide an efficient competitive auction for all suppliers. (Pub. Util. Code, § 355.)

In order to determine the SRAC of the public utilities, the Legislature ordered the computations to be based on the clearing price paid by the PX.[6] However, since the PX was not yet operating, the Legislature provided an interim formulistic approach that was to be used until such time as the Commission issued an order declaring the PX was properly functioning.

---

[6]On February 16, 1996, Edison, on behalf of itself, the Independent Energy Producers Association and the California Cogeneration Council had filed a joint proposal for reform of the SRAC based upon a market based energy price. (See Petition by Edison to Modify Transition Formula (July 28, 2000) appen. A.)

(Pub. Util. Code, § 390 subds. (b) (c).)[7] The Legislative formula set a starting price that was to be adjusted monthly to reflect changes in the natural gas prices at the California border.

The Commission, in compliance with the mandate of the Legislature, issued Decision No. 96-12-028 on December 9, 1996. (*Re Biennial Resource Plan Update, supra*, 69 Cal.P.U.C.2d 546.) In that ruling, the Commission determined that it was "reasonable to use a simple average of California/ Arizona (Topock)[8] indices . . . for purposes of *calculating monthly changes to SCE's* [Edison] *and SDG&E's* [San Diego Gas & Electric] *interim SRAC formula.*" (*Id.* at p. 552, italics added.)

It was assumed by most of the parties that the transition formula was to have a short duration. However, by 2000 the power market was in a chaotic state, energy costs were beginning to spiral upward, and the PX had still not been certified as operating properly within the meaning of section 390. In April 2000, the Commission filed a complaint[9] with the FERC which alleged, among other things, that El Paso Natural Gas Company and its affiliates were engaging in "unreasonable and anticompetitive practices" that could end up costing California taxpayers more than $100 million. Specifically, the Commission alleged that traders and transporters of natural gas were exercising their market power to inflate the price of natural gas delivered at the California border.

On July 28, 2000, Edison filed a petition to modify Decision No. 96-12-028. Edison sought a revision of the formula, contending that the SRAC being paid to the QF's was exceeding Edison's actual avoided cost in violation of PURPA. On August 28, 2000, the Office of Ratepayer Advocates (ORA)[10] filed a response generally in support of Edison's position. However, given the Commission's complaint with FERC and other adverse developments that had occurred in the spot market, ORA raised the question whether the Topock Index was sufficiently robust to be used in the transition formula. ORA noted that the cost of transporting natural gas had decreased while the cost of natural gas had tripled. As a result, ORA noted that Edison's ratepayers were experiencing substantially higher natural gas prices

[7]Further references to a section with a number shall be references to the Public Utilities Code.

[8]Topock is on the California/Arizona border and is the entry point for gas from the Southwest into California.

[9]See *Public Utilities Com. of the State of California v. El Paso Natural Gas Co.* (FERC, Dec. 27, 2001, No. RP00-241-000) [2001 WL 1656629].

[10]ORA is a division of the Commission and is charged with advocating consumer interests.

"while reeling under a rigidly adopted value of the factor[11] within the SRAC formula." ORA further stated, "Indices that rely upon an abused market are not a reasonable measure of avoided cost."

On August 31, 2000, three days after ORA filed its response, Edison filed the first of two emergency petitions, pursuant to Commission rule 81, seeking a Commission provisional SRAC "posting" using the lower of the gas price derived from the Topock Index for the month of August 2000, or the current Topock Index for the current posting month. Edison urged immediate action because the price differential[12] increase in gas prices was more than 10 times higher than what had caused the Commission to file its complaint with FERC in April. The result to the ratepayer was that the QF's, in the month of August alone, would be paid more than $29 million to which they were not entitled.

The next day, September 1, 2000, the assigned administrative law judge (ALJ) issued a ruling expanding the Edison petition to modify Decision No. 96-12-028 to include the issue of whether the Topock Index was reliable and valid enough to be used as a means of determining Edison's SRAC. On September 5, 2000, the assigned ALJ issued a draft decision setting a briefing schedule and ordering the parties to "comment and provide substantive analysis on the issue of irreparable harm to rate payers or market participants should the Commission choose to adopt a provisional posting." One month later, on October 5, 2000, four Commissioners voted to deny relief finding there was no evidence that ratepayers were being harmed. In dissent, Commissioner Wood stated that the mechanism for determining the SRAC was flawed and favored QF's.

On November 28, 2000, Edison, fearing that the Topock Index was going to be three times higher than it had been in August, filed yet another emergency petition. In that petition, Edison requested the Commission to replace the Topock Index with a new proxy consisting of 10 percent of the Topock Index and 90 percent of Edison's core subscription weighted average cost of gas (WACOG). Edison argued that it appeared the payments to QF's were going to increase by about $115 million over the amount of the previous month. This increase would amount to a substantial windfall to some of the QF's, because many QF's used little or no natural gas. Edison also contended that the Topock border point was being subjected to price

[11]This is a discrete part of the transition formula that is used to determine avoided costs of energy.

[12]The "price differential" is the difference between what the price of gas is at the well head basin and the price at the California border. In April it had been a 30 cents differential. By the time of the filing of the petition, it had risen to almost $3.

manipulations. Edison further pointed out that the Topock Index was not a reliable factor for measuring Edison's avoided costs because Edison bought very little natural gas at the Topock spot price. Rather, Edison had several long-term contracts with other suppliers that enabled it to purchase gas at rates more favorable than the Topock spot price. Once again Edison urged the Commission to modify Decision No. 96-12-028 since the transition formula did not measure Edison's avoided costs, which is what is required under PURPA.

On December 15, 2000, the FERC issued a ruling in *San Diego Gas & Electric Co., Complaint v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange et al.* (Dec. 15, 2000) 93 FERC ¶ 61,294, 61,982, eliminating the public utilities' mandatory buy and sell requirements from the PX. The FERC also terminated the PX's wholesale rate schedules.

On January 20, 2001, Commissioner Wood issued a draft decision (Draft Decision) granting Edison's motion to modify Decision No. 96-12-028 by replacing the Topock Index with indices published each month for the California-Oregon border-point at Malin[13] plus an interstate transportation charge (the Malin Index). Two months later, on March 15, 2001, the PX filed for protection under the bankruptcy laws. It has not been in operation since that date.[14] Less than a week later, on March 21, 2001, the Commission circulated a revised copy of the Draft Decision calling for legislative repeal of section 390. The reason given was that the "possibility of market power abuse on the El Paso pipeline coupled with reduced liquidity in the Topock market" had convinced the Commission that Topock no longer met the requirements of a robust market that was required in Decision No. 96-12-028.

Six days later, on March 27, 2001, the Commission modified Decision No. 96-12-028 by issuing Decision No. 01-03-067. The Decision is the subject of the writs before this court that we are presently reviewing. The Decision, which was a modified version of the Draft Decision, revised the "factor" in the transition formula and ordered that it be updated on a monthly basis. Decision No. 01-03-067 also modified Decision No. 96-12-028 by substituting the Malin Index for the Topock Index in Edison's transition formula on the ground that the Topock Index was no longer sufficiently

---

[13]Malin is at the California/Oregon border and is the entry point for Canadian gas which was used by PG&E.

[14]For a discussion of the problem see *In re California Power Exchange Corp.* (9th Cir. 2001) 245 F.3d 1110.

robust to serve as a proxy for Edison's avoided fuel procurement cost. There was no mention of a Legislative repeal of section 390.[15]

## THE CONTENTIONS OF THE PARTIES

CCC, County of Los Angeles and IEPA each contend that the Decision violates section 390 and PURPA. Additionally, the County alleges the Decision discriminates against QF's, violates due process and amounts to an impermissible taking without due compensation.

Edison contends the Commission is in violation of PURPA because it is forcing Edison to pay more than its avoided costs to the QF's from which it buys electricity.

## STANDARD OF REVIEW

This is not a complaint or enforcement proceeding nor is it a ratemaking or licensing decision. Therefore, we review, on the basis of the entire record, whether (1) the order or decision was an abuse of discretion; (2) the Commission proceeded in the manner required by law; (3) the Commission acted without or in excess of its jurisdiction; (4) the decision is not supported by the findings; (5) the order or decision was procured by fraud; and (6) whether the constitutional rights of the petitioners were violated. (§ 1757.1.)

## THE IEPA, CCC, AND COUNTY PETITIONS

### 1. *The Decision Did Not Violate section 390*

Section 390, subdivision (b) states: "(b) Until the requirements of subdivision (c) have been satisfied, short run avoided cost energy payments paid to non-utility power generators by an electrical corporation shall be based on a formula that reflects a starting energy price, adjusted monthly to reflect changes in a starting gas index price in relation to an average of current California natural gas border price indices. The starting energy price shall be based on 12-month averages of recent, pre-January 1, 1996, short-run avoided energy prices paid by each public utility electrical corporation to non-utility power generators. The starting gas index price shall be established as an average of index gas prices for the same annual periods."

The Legislature did not prescribe a specific formula. Rather, it prescribed a general formula to be transitional until such time as the PX was up and

---

[15]While not a basis for this decision, it is apparent that the Legislature needs to reexamine section 390. In its present form, section 390 acts as a millstone around the Commission's neck.

running properly. Although not mentioned in either the Decision or in the orders denying rehearing it is now becoming obvious that the PX will never properly function.[16] Thus, it was up to the Commission to arrive at a formula that met the requirements of section 390 and also complied with PURPA.

One of the requirements of the section 390 formulation was that the SRAC was to take into account "current natural gas border price indices." The Commission also noted that more than four years had passed since the original formulas had been in place and it was time to revisit the formula and the components of that formula. That is exactly what the Commission did. After noting the wildly fluctuating prices along the Arizona/California border the Commission "concluded that the Topock Index was no longer robust and could no longer serve as a proxy for utility avoided costs." (Dec. No. 02-02-028, p. 8.) The Commission then concluded that "adopting a Malin border price plus interstate transportation as a temporary replacement for Topock meets the requirements of section 390(b)." (*Id.*, p. 20.) County argues that this was error because Edison does not procure its natural gas from Malin. However, the evidence before the Commission was that Edison buys very little natural gas on the spot market. Using the Topock Index as the basis for the section 390 formulation thus caused Edison's avoided costs to be overstated in violation of PURPA. Whether the Malin or Topock indices or any combination thereof should be used was a decision for the Commission and not for this court. (*Eden Hospital Dist. v. Belshe* (1998) 65 Cal.App.4th 908, 915 [76 Cal.Rptr.2d 857].)

CCC further argues that section 390 must somehow be contrary to PURPA because, in a revised draft of the Draft Decision, the Commission urged the repeal of section 390. However, CCC overlooks the omission of this request in the final version of the Decision. Only filed decisions are the final opinions or decisions of the Commission. (§ 310.) The argument will be disregarded.

CCC also argues that the Decision violates section 390 "by employing current natural gas transportation prices in the newly resurrected index methodology. This imports post-1996 indices in the starting energy price, contrary to the explicit language of section 390 [subdivision (b)]." However, the Commission's ruling did not change the starting price. What was changed was the border index and Edison's energy factor. CCC further

---

[16]See footnote 12, *ante*, and *San Diego Gas & Electric Co., Complainant v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange et al., supra*, 93 FERC ¶ 61,294, 61,982.

argues that section 390 requires the components to the formula "shall be based upon on 12 month averages of recent, pre-January 1996 short-run avoid prices." What CCC ignores in its analysis is that section 390 also requires the starting price to be changed monthly to reflect changes in the index. The Commission recognized this in 1996 when it arrived at its original decision on section 390. (Cal.P.U.C. Dec. No. 96-12-028, *Re Biennial Resource Plan Update, supra,* 69 Cal.P.U.C.2d 546, 553-554.) As the Commission stated in the order granting limited rehearing, "[T]he transition formula has been in place for over 4 years. It would be unreasonable to believe that this interim formula would still accurately reflect current utility avoided costs." (Dec. No. 96-12-028, p. 12.) To the extent that CCC is arguing that the Commission is forever wedded to the pre-1996 figures and cannot take current prices into account, CCC is in error.

County alleges that there was, and remains, a question as to whether the Malin Index was a proper proxy to replace the Topock Index. The evidence presented to the Commission, however, reveals that the prices at Malin were not spiraling out of control as were the Topock prices. Secondly, when Decision No. 96-12-028 was decided, both Malin and Topock were deemed to be sufficiently robust to meet the requirements of section 390, subdivision (b). The evidence presented to the Commission was that Topock was no longer robust. There was no evidence indicating that Malin was no longer robust. The fact that Edison did not buy gas from the Malin exchange does not mean Malin could not be used as an index. Rather, as the Commission pointed out in its denial of rehearing, "Section 390 (b) does not require that the gas border prices represent where the utility would procure its gas, but rather whether the gas border price is a reasonable proxy for utility's avoided cost." (Dec. No. 02-02-028.)

Finally, CCC and County both argue that they are forced to pay the Topock prices and that it is unfair to allow Edison not to pay the same price they are forced to pay. However, QF's have never been absolutely entitled to a payment to cover their costs. What is being measured is the utilities' SRAC, not that of the QF. As Congress stated in title 16 United States Code Annotated section 824a-3(b), a utility shall not be required to pay a QF more than the utilities' avoided cost. (See also 18 C.F.R. § 292.304(a) (2002).)

### 2. The Parties' Due Process Rights Were Not Violated Because of a Lack of Hearing

Section 1708.5, subdivision (f), which was added in 1999 (Stats. 1999, ch. 568, § 2) provides: "Notwithstanding Section 1708, the commission may

conduct any proceeding to adopt, amend, or repeal a regulation using notice and comment rulemaking procedures, without an evidentiary hearing, except with respect to a regulation being amended or repealed that was adopted after an evidentiary hearing, in which case the parties to the original proceeding shall retain any right to an evidentiary hearing accorded by Section 1708." Here, the evidence shows that Decision No. 96-12-028 was a regulation that had been adopted without any evidentiary hearings. Thus, by its terms section 1708.5, subdivision (f), permitted the procedure employed by the Commission in this case.

However, IEPA argues that section 1708.5 is a special section that enables the Commission to "permit interested parties to petition the commission to adopt, amend or repeal a regulation." IEPA further contends that since neither Decision No. 96-12-028 nor the Decision in this case arose out of a petition pursuant to section 1708.5, subdivision (f), simply does not apply. In response, the Commission notes that there are two different types of proceedings covered by section 1708.5. In subdivisions (a) through (e), the Legislature set up a procedure to allow interested parties to petition the Commission for adopting, repealing or amending regulations. In subdivision (e), the Legislature directed the Commission to amend its Rules of Practice and Procedure to establish procedures for handling petitions under section 1708.5. This the Commission has done in the so-called Wright Petitions procedure.

The Commission further argues that section 1708.5, subdivision (f), was intended to cover not only petitions pursuant to subdivisions (a) through (e), but also any proceeding. This intent is shown by the reference to "any proceeding." We agree with the Commission and have concluded that subdivision (f), applies to proceedings other those initiated by the petition procedure of subdivisions (a) through (e). Had the Legislature intended subdivision (f) to be applicable only to proceedings initiated by petition, then the Legislature would have used language such as "any such proceeding," or "any proceeding initiated by petition" or other limiting language. ■ We must assume that Legislature knew what it was doing and meant the words to be applied as they were written. (*City of Ontario v. Superior Court* (1993) 12 Cal.App.4th 894, 902 [16 Cal.Rptr.2d 32].) Since the Legislature did not impose any limitation, it would be improper for this court to add words to limit or change the plain meaning of the statute. (*People v. Baker* (1968) 69 Cal.2d 44, 50 [69 Cal.Rptr. 595, 442 P.2d 675]; *Cisneros v. Vueve* (1995) 37 Cal.App.4th 906, 910 [44 Cal.Rptr.2d 682].) The language of the statute is plain, clear and unambiguous. Therefore, there is no need to resort to statutory construction unless it clearly appears that the language

used is contrary to what the Legislature intended. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297]; *Cisneros v. Vueve, supra,* 37 Cal.App.4th 906, 910.) Here, there is no evidence that the Legislature meant anything other than what it wrote. Accordingly, there is no need to indulge in statutory construction or resort to other indicia of legislative intent to interpret the statute. (*Hale v. Southern Cal. IPA Medical Group, Inc.* (2001) 86 Cal.App.4th 919, 924 [103 Cal.Rptr.2d 773].)

 IEPA next contends that *California Trucking Assn. v. Public Utilities Com.* (1977) 19 Cal.3d 240, 244 [137 Cal.Rptr. 190, 561 P.2d 280], mandates that the opportunity to be heard requires at a minimum the right to present evidence. In *California Trucking,* the court was concerned with the statutory right to be heard as set forth in sections 1701 through 1708. In that instance the court, based on statutory language, held that when the Commission alters or rescinds a prior order the right to be heard includes a right to present evidence. Here, in section 1708.5, the Legislature has said there is no right to an evidentiary hearing provided that the original regulation was not enacted following an evidentiary hearing. ██ ██ Since Decision No. 96-12-028 was not enacted following an evidentiary hearing, IEPA had no right to an evidentiary hearing prior to the amendment of Decision No. 96-12-028.[17]

### 3. *There Was No Taking Within the Meaning of the Federal and State Constitutions*

 The County contends the SRAC Decision constitutes a taking because the substitution of the Malin Index for the Topock Index resulted in payments less than the utility's avoided costs in violation of PURPA. Specifically, the County alleges that it and other QF's entered into long-term

---

[17]This court is aware that at some point a failure to hold hearings could be a violation of due process. However, that point has not been reached in this case. "Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' (*Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961).) To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484].)

gas contracts based upon the Topock Index. These QF's have been harmed because they were not given the chance to allow their contracts to be renegotiated or expire. As the Commission stated in its order granting limited rehearing, "Applicants' takings claims are premised on their assertions that the Modified Formula results in SRAC prices below their operating costs. However, SRAC payments were never intended to reflect QF operating costs. Rather PURPA 'caps' SRAC payments at the utility's avoided costs. (18 C.F.R. § 292.304(a)(2) (2002).)" (Dec. No. 02-02-028.) County has failed to demonstrate that the SRAC was below Edison's avoided costs and therefore the argument fails.

### THE EDISON PETITION

#### 1. *Edison Waived Its Right to Complain About the Use of the Malin Index*

Edison initially urged the Commission to modify the formula by substituting the Malin Index for the Topock Index. Later, in its emergency motion of November 28, 2000, Edison requested that the Commission adopt a 90-10 formula in place of the Topock Index. Ten percent was to be the Topock indices and 90 percent was to be based on Edison's monthly-published cost of gas. This request was denied in favor of the Malin Index originally requested by ORA and further suggested by Edison. Edison now contends use of Malin was error since the Commission did not make specific findings as required by section 1705. Edison, however, failed to raise this issue in its petition for rehearing. At best, Edison made a request that the Commission make a better record of its reasons. Edison did not protect the use of Malin as error. Rather, Edison apparently seemed to be attempting to have the Commission state that section 390 was either inconsistent with federal law or was unlawful. Having failed to specifically address the alleged error of using the Malin Index to the Commission, Edison may not raise it before this court. (§ 1732.)

#### 2. *In Failing to Consider the Retroactive Application of the Modified Formula, the Commission Erred*

On November 28, 2000, Edison filed its second motion for relief. This motion, entitled an "Emergency Motion," sought immediate relief from compelled overpayments it was making to QF's because the section 390, subdivision (b) transition formula payments were "hardwired" to the Topock border price indices. Because of the increase in gas prices at Topock, payments to QF's were likely to increase by $115 million from November for a total of $180 million in December. Edison asked for immediate relief

and requested the Commission to act on the request at its December 7, 2000, meeting. Edison further requested a new transition formula that would have had the Topock indices counting for only 10 percent of the figure with the other 90 percent being Edison's monthly-published schedule G-CS cost of gas. Finally, Edison requested the Commission to either allow Edison to defer its avoided cost posting until December 7, 2000, or inform the QF's and other interested parties that any modifications to the transition formula would be retroactive to all QF deliveries commencing December 1, 2000.

On December 1, 2000, the two assigned commissioners and two administrative law judges issued an order suspending the avoided cost posting requirements for Pacific Gas and Electric Company (PG & E), San Diego Gas and Electric Company (SDG & E) and Edison until December 7, 2000. The ruling also designated a briefing schedule. On December 7, 2000, a draft decision was issued that would have adopted the relief requested by Edison for Edison, PG & E and SDG & E. On January 10, 2001, Commissioner Wood issued a draft decision granting relief to Edison only, and changed the applicable index from Topock to Malin. Thereafter, more comments were made by interested parties and on March 27, 2001, the Commission issued its Decision (Dec. No. 01-03-067) modifying Decision No. 96-12-028. The Decision replaced the Topock Index with the Malin Indices. Edison and the other parties petitioned for a rehearing. Edison requested that the modification of the transition formula be applied retroactively to December 2000, when the motion had originally been filed. Edison's request was denied on December 17, 2001, with the Commission stating: "Although we have authority to consider retroactive adjustment of SRAC prices, we decline to do so in this instance. A decision to consider retroactive adjustment of SRAC prices could increase the uncertainty in the current QF market, since many QFs appear to have continued operations with the expectancy that they would eventually be 'made whole' by the utilities. Moreover, investigation into the robustness of the various indices could require significant commitment of Energy Commission staff due to the potential complexity involved and further strain the Commission's current resources. Furthermore, we have previously declined to allow retroactive downward adjustments of posted prices. [Citations.] While we believe this situation is distinguishable, we believe that the need to provide pricing certainty for QFs, which were articulated in those decisions, also applies in this case. Therefore, under these circumstances, we do not believe retroactive adjustment would be in the public interest." (Dec. No. 01-12-025, p. 4.)

In declining to even consider the request, the Commission erred. In enacting PURPA, the Congress declared that the transmission of electrical

power was of national interest and that FERC was to have jurisdiction over the sale of electrical energy in interstate commerce. (16 U.S.C.A. § 824.) In order to promote the use of QF's and prevent states from imposing onerous obligations upon QF's, FERC was given the exclusive right to license and regulate QF's. (See 16 U.S.C.A. §§ 824a, 824a-3.) One of the key provisions of PURPA was the requirement that public utilities buy power from QF's. (*FERC v. Mississippi, supra,* 456 U.S. 742.) However, while the public utilities were required to buy QF power, they were not required to pay more than what it would have cost the utility to generate the electricity, or purchase it from another source. (16 U.S.C.A. § 824a-3(d).)

Congress's rationale for adopting this procedure was explained by the FERC in 1995. "When Congress enacted PURPA in 1978, there was very little non-utility generation. In 1978 virtually all new generating capacity was provided by traditional electric utilities. In fact, one of the principal reasons Congress adopted section 210 of PURPA was because electric utilities had refused to purchase power from non-utility producers. In contrast to 1978, non-traditional producers, including QFs, now provide well in excess of half of all new generating resources, and the Commission has determined that there is no longer any dominance in the provision of new generating capacity.

"One of the reasons for the dramatic growth of the QF industry was the Commission's policy decision in 1980 to set the maximum rate permissible under PURPA section 210(b), i.e., a full avoided cost rate. While such rates do not result in direct benefits to ratepayers, they nevertheless are fully consistent with PURPA section 210(b)'s requirement that the rates be just and reasonable to ratepayers and in the public interest. Nevertheless, PURPA does not permit either the Commission, or the States in their implementation of PURPA, to require a purchase rate that exceeds avoided cost." (*Re Southern California Edison Co., Re San Diego Gas and Electric Co.* (1995) 70 FERC ¶ 61,215, fns. omitted.)

By 2001 the situation had so drastically changed that the FERC commented, "The Commission has recognized, that as time has passed since the passage of PURPA, the need to ensure that the states are using procedures which will assure that QF rates do not exceed avoided costs has become more critical." (*City of Ketchikan, Alaska, Copper Valley Electric Association, Inc., City of Petersburg, Alaska, City of Wrangell, Alaska* (2001) 94 FERC ¶ 61,293, 62603, fn. 16.) Here, by failing to make a decision as to whether the SRAC prices should be applied retroactively, the Commission ran afoul of the Congressional mandate that public utilities not pay QF's more than the avoided cost.

It may be that the evidence will show the SRAC prices were correct for the period of December 2000 through March of 2001. If the Commission makes this determination and it is based upon substantial evidence, that will end the matter. However, if the evidence shows that the formula in Decision No. 01-03-067 should have been applied retroactively to arrive at a more accurate SRAC, then it is the Commission's duty to apply it retroactively. The Commission does not have the power to thwart Congressional intent by having a policy inconsistent with that set forth in PURPA. (*Independent Energy Producers Ass'n, Inc. v. CPUC* (9th Cir. 1994) 36 F.3d 848, 854-55.)

### DISPOSITION

Decisions Nos. 01-03-067, 01-12-028 and 02-02-028 are affirmed except to the extent that the Commission declines to consider whether the SRAC should be applied retroactively. That portion of those Decisions is annulled.

The matter is remanded back to the Commission for proceedings consistent with this opinion.

Lillie, P. J., and Woods, J., concurred.

On September 30, 2002, the opinion was modified to read as printed above. The petitions of all petitioners for review by the Supreme Court were denied November 26, 2002. Baxter, J., and Chin, J., did not participate therein.